MARY BRICKELL, *Appellant*, v. PARK TRAMMEL, GOVERNOR, W. V. KNOTT, COMPTROLLER, J. C. LUNING STATE TREAS-URER, T. F. WEST, ATTORNEY GENERAL, W. A· McRAE, COMMISSIONER OF AGRICULTURE, CONSTITUTING THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, *Appellees*.

## Opinion filed May 5, 1919.

1. Under the Common Law of England the Crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in trust for the people of the realm who had rights of navigation, commerce, fishing, bathing and other easements allowed by law in·the waters. This rule of the common law was applicable in the English Colonies of America.

2. After the Revolution resulting in the independence of the American States, title to the beds of all waters, navigable in fact, whether tide or fresh, was held· by the States in which they were located, in trust for all the people of the States respectively.

3. When the Constitution of the United States became operative, the several States continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of disposition to individual ownerships, but such title was held· in trust for all the people of the State respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the States under the Federal Constitution.

4. The rights of the people of the States in the navigable waters and lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing, and other easements al-

lowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the States and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, &c. and to the constitutional guarantees of private property rights.

5. The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States. For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means, grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and waters, or so as to interfere with the lawful authority of Congress.

6. New States, including Florida, admitted "into the Union on equal footing with the original States, in all respect whatsoever," have the same rights, prerogatives and duties with respect to the navigable waters and the lands thereunder within their borders as have the original thirteen States of the American Union. Among these prerogatives are the right and duty of the States to own and hold the lands under navigable waters for the benefit of the people, as such prerogatives are as essential to the sovereignty, to the complete exercise of the police powers and to the welfare of the people of the new States as of the original States of the Union.

7. At common law those who own land extending to ordinary high water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, etc., common to the public, have in general certain special rights in the use of the waters opposite their holdings, among them being the right of access from the water to the riparian land and such other rights as are allowed by law.

35—Vol. 77.

8.  The common law riparian rights that arise by implication of
    law give no title to the land under navigable waters except
    such as may be lawfully acquired by accretion, reliction and
    other similar rights.  These special rights are easements
    incident to the riparian holdings and are property rights
    that may be regulated by law but may not be taken without
    just compensation and due process of law.

9.  In addition to the common law riparian rights in navigable
    waters, the lawmaking power of the State may grant to ri-
    parian proprietors owning to high water mark on the navi-
    gable waters of the State, easements in the lands below high
    water mark contiguous to the riparian holdings, for the pur-
    pose of constructing thereon facilities for reaching navi-
    gable water that may be opposite or in front of the uplands
    with rights of action to protect the easements granted
    against unlawful intrusion or trespass by other private part-
    ies; provided such facilities do not materially impair the
    rights of the public in the navigable waters.  Like common
    law riparian rights such granted easements when effective,
    are secured by organic provisions for the protection of pri-
    vate property rights, subject to the authority of Congress
    as to navigation.  But such granted easements and rights
    give no title to islands or to lands below high water mark.

10. Private ownership of land riparian to navigable waters in
    this State extends ordinarily to high water mark.  This ap-
    pears to be the rule of the civil law as well as of the com-
    mon law.

11. After the United States acquired by treaty of cession from
    Spain the territory known as East and West Florida, such
    territory was held subject to the constitution and laws of
    the United States.

12. A demurrer in equity does not admit legal conclusions as-
    serted in the bill of complaint, or conclusions of fact not
    justified by the facts alleged, or assertions of ultimate facts
    that are not sustained by the facts alleged.  This is partic-
    ularly so when the right asserted as a conclusion of law or

of fact depends upon unusual provisions of law and proceedings thereunder and no such provisions and proceedings are made to appear.

13. Even if in this State lands below high water mark may be the subject of ownership by private parties, such a right would be a most unusual and extraordinary one that should be particularly shown when claimed in a suit.

14. Under the Spanish law as well as under the law of this State private ownership of uplands stops at high water mark on navigable waters, except, perhaps, under special and particular provisions and action of sovereign governmental authority, and those claiming ownership below high water mark must show the sources and muniments of title from competent authority to make such a grant against the rights of the public in the shores and waters of navigable waters in this State.

15. The Riparian Act of 1856 confers rights only upon the classes of persons stated therein who own land that is actually bounded by and extends to low water mark, an navigable streams, bays and harbors.

16. An allegation that complainant's upland extends "to the low water mark of Biscayne Bay, an arm of the Atlantic Ocean and a navigable body of water," is not admitted by a demurrer when such allegation is contrary to general law and is not sustained by, but is inconsistent with other specific allegations, and the exhibits to the bill of complaint.

17. In suits for the removal of clouds from title as a general rule, an allegation in the bill that complainant is the owner in fee of the lands in question, and in the actual possession thereof, or that the lands are wild, unimproved, or unoccupied, if such be the case, is sufficient, without setting out in detail the facts showing such ownership, as ownership is the ultimate fact and the others are mere evidentiary facts. If, however, in addition to an allegation of ownership in fee, the facts which constitute the title, of whatsoever nature

they may be, are also set out, and such facts show title not to be in the complainant, a demurrer to the bill will lie.

18. In suits to remove cloud upon title to real estate or for similar relief the complainant must show with clearness, accuracy and certainty the validity of her own title and the invalidity of the claim or act of the opposing party; and she must rest upon the strength of her own title and not upon the lack of right in the opposing party; and she must show documentary title or title by adverse possession and that she is actually or constructively in possession of the lands, or at least that the opposing party is not in possession.

19 A mere assertion of ownership of submerged lands, the title to which is held by the State in trust for the people of the State is insufficient to show such ownership, and such assertion is not admitted by the demurrer when it is inconsistent with the facts alleged and with the law of the case.

20. The Riparian Act of 1856 gives no title to islands or to lands below high water mark in navigable waters of the State. Land does not pass as appurtenant to land.

An Appeal from the Circuit Court for Dade County; H. Pierre Branning, Judge.

Decree affirmed.

*E. M. Semple and Edward L. Semple,* for Appellant.

*Glenn Terrell,* for Appellees.

WHITFIELD, J.—In a fourth amended bill of complaint filed by the appellant against the Trustees of the Internal Improvement Fund of the State of Florida, it is alleged that "she is the owner of and is seized in fee simple in actual possession

of the piece of land described as all that part of Lot 1 of Block 103, lying East of Brickell Avenue and Brickell Avenue projected straight to the waters of Miami River, said lot and said Avenue being as they are shown on a map or plat designated as Amended Map of Brickell Addition to the map of Miami and recorded in Plat Book B at page 113 in the office of the Clerk of the Circuit Court of Dade County, Florida, which lot lies upon and extends East to the low water of Biscayne Bay, an arm of the Atlantic Oecan and a navigable body of water; that she is the owner and is in possession of all riparian rights appurtenant to said land, and that she is also in possession of and the owner of the legal title to the submerged land lying east of and contiguous to the aforesaid Lot 1, and extending to the original and natural channel of Biscayne Bay, and lying between the lines of said Lot 1 drawn and extended at right angles to said original and natural channel of said Biscayne Bay, her title to said submerged lands being subject, of course, to the trust under which it was held by the State of Florida prior to December 27, 1856, which said lot is a portion of Section 38, Township 54, South of Ranges 41 and 42, East, Tallahassee meridian, and that said ownership, seizin, and possession embraces the said riparian rights, submerged land and a certain partially submerged tract or island, together with a certain submerged portion thereto contiguous, lying in Biscayne Bay near and in front of the Miami River, containing approximately five acres; which lies East of the Shore of said Lot 1, and between the shore of said Lot 1 and the original and natural channel of Biscayne Bay, and between lines of said Lot 1 projected at right angles to the said natural channel of said Biscayne Bay from the Northeasterly and Southeasterly corners of said Lot 1. The said original and natural channel of Biscayne Bay runs

practically parallel with the shore line of said Section 38, which Seciton lies upon and is bounded on the East by the said Biscayne Bay; that the aforesaid 'certain partially submerged tract or island, together with a certain submerged portion thereto contiguous, lying in Biscayne Bay, near and in front of the Miami River, containing approximately five acres,' may be more particularly described as follows:

"Commence at the intersection of the North boundary of Eighteenth Street of the City of Miami, Florida, according to a plat of said city on record in the office of the Clerk of the Circuit Court of Dade County, Florida, in Book 'B' of Plats at page 41, projected Easterly, with the high water mark of Biscayne Bay, thence run Easterly along the said North line of Eighteenth Street, produced straight further Easterly, a distance of 372 feet; thence North a distance of 213 feet, to a place of beginning of a more accurate description of the said island; thence run North 613 feet; thence East 325 feet; thence South 613 feet; thence West 325 feet, to the place of the beginning of this tract."

It is further alleged that complainant is seized and possessed of the upland lot under and by virtue of deeds of conveyance from private parties made exhibits to the bill of complaint. These exhibits cover lands "known as a donation to Mrs. Rebecca Hagan by the United States Government, and approved 20th May, 1824." The complainant does not exhibit a patent or other paper title from any sovereignty. Her first muniment of title is a conveyance executed in 1874.

Complainant also alleges that she "is seized of said 'partially submerged tract or island, together with a certain submerged portion thereto contiguous, lying in Biscayne

Bay, near 'and in front of the Miami River,' by virtue of the deeds of conveyance to her which are particularly referred to in the third paragraph of this bill, by which deeds the respective parties, grantors therein, conveyed to your oratrix the aforesaid Section 38 and the riparian rights incident thereto, and the submerged lands contiguous to the said Section 38 extending to the channel of Biscayne Bay and lying between the Northerly and Southerly lines of said Section 38 projecting at right angles to said channel of Biscayne Bay; that her predecessors in title were seized of said Lot 1 and the riparian rights incident thereto and of the legal title to said 'partially submerged tract or island', together with a certain submerged portion thereto contiguous, lying in Biscayne Bay near and in front of the Miami River,' subject to the trust by which it was held by the State of Florida prior to December 27, 1856; that one of her predecessors in title, who was then a citizen of the United States, was seized and was the owner of the fee simple title to said Section 38 of which said Lot 1 is a part, on December 27, 1856, and by virtue of 'an act to benefit commerce,' passed by the legislature of Florida, and approved December 27, 1856, became on said December 27, 1856, the owner of all the right, title and interest to the lands covered by water lying in front of said Section 38, and between the Northerly and Southerly lines of said Section 38 extended at right angles to the channel of Biscayne Bay, that the said partially submerged tract or island was then land lying in front of said Section 38 and was covered by water; that on June 3, 1892, the date on which the 'Revised Statutes of the State of Florida' became effective, one of your oratrix' predecessors in title, which predecessor was on that date a citizen of the United States, owned the aforesaid Section 38 and was a riparian proprietor of said Section 38, and by virtue of Section

454 and 455 of said Revised Statutes of the State of Florida became vested, if not already so vested with all right, title and interest to all lands covered by water lying in front of said tract of land known as said Section 38 and extending to the channel of Biscayne Bay and lying between lines drawn at right angles from the Northerly and Southerly corners of said Section 38 to the channel of said Biscayne Bay, which title was subject, of course, to the trust in which it was held by the State of Florida prior to December 27, 1856; that on the first day of December, A. D. 1906, the date on which the General Statutes of the State of Florida became effective, your oratrix was a citizen of the United States, owned the aforesaid Lot 1 embraced in the aforesaid Section 38, and was a riparian proprietor of said Section 38, it being bounded on the East by the waters of Biscayne Bay, and by virtue of Section 643 and 644 of said General Statutes of the State of Florida became vested, if she was not already so vested, with all the right, title and interest to all lands covered by water lying in front of said Lot 1, which lot was and is bounded on the East by the waters of said Biscayne Bay, and lying between lines drawn at right angles from the Northerly and Southerly corners of said Lot 1 to the channel of said Biscayne Bay, which title was subject, of course, to the trust in which it was held by the State of Florida, prior to December 27, 1856; that neither your oratrix' title nor that of her predecessors in title, to said land covered by water extended or extends East of the original or natural channel of said Biscayne Bay; that subsequent to the time of acquiring the title to the said submerged land contiguous to said Lot 1 by virtue of the deeds above described there was dug in Biscayne Bay, extending in a Northerly and Southerly direction and being entirely East of the aforesaid 'certain partially submerged

tract or island, together with a certain submerged portion thereto contiguous, lying in Biscayne Bay near and in front of Miami River,' a channel for the purpose of aiding navigation between Miami, Florida, and the deep water of the Atlantic Ocean by way of Cape Florida, this channel being hereinafter referred to as channel Number One, and subsequent to the acquiring of the title to the aforesaid land by your oratrix as aforesaid still another channel, which is hereinafter referred to as Channel Number Two, was dug from the mouth of the Miami River, near to the mainland of the aforesaid Lot 1 owned by your oratrix as aforesaid, into chanel number one. In the digging of channel number two a quantity of dirt was dug up from the bottom of Biscayne Bay and was thrown up on the East side of the said channel number two, and between said channels number one and two, forming a submerged tract of land which was gradually and imperceptibly added to by the action of the waters in Biscayne Bay and the Miami River; and still later, about four years ago, during a certain dredging operation in and about the mouth of the Miami River and in said channel number two more dirt was dug from the bottom of Biscayne Bay and was thrown upon the said submerged tract of land lying immediately East of said channel number two until a part of said submerged island extended out of the water and was not covered by high tide; and since that time this island has been gradually and imperceptibly added to by the action of the waters of Biscayne Bay and the Miami River, until it is now an island at high tide of approximately one acre, not as much being exposed at high tide as is described in the particular description above; that prior to the digging of the two aforesaid channels the deepest water in, or thread of the stream or channel of Biscayne Bay was about one mile East from the afore-

said Lot One and it was about three-quarters of a mile East of the aforesaid Lot 1 to the edge of the original or natural channel or stream of Biscayne Bay, which said original or natural channel was wholly and entirely East of the aforesaid certain partially submerged tract or island. Your oratrix alleges that prior to the digging of the said channels number one and two the waters from the Easterly line of said Lot 1 extending East in Biscayne Bay beyond the Easterly boundary of the aforesaid 'partially submerged tract or island' was shallow and could not be used for the purpose of navigation, and there was no navigable channel between the Easterly line of said Lot 1 and the Eastern extremity of the aforesaid 'certain partially submerged tract of land,' together with that portion of said island which may be submerged and not over a depth of two feet. Your oratrix further alleges that the two aforesaid channels were artificially made, and being so made, have not changed her title in and to, and her ownership of the submerged land, or her right, title and interest in and to the lands covered by water and lying in front of said Lot One and between lines projected at right angles from the Notheasterly and Southeasterly corners of said Lot One to the original or natural channel of Biscayne Bay, an would not deprive her of the ownership of the said 'certain partially submerged tract or island, which said certain partially submerged tract or island became her property by virtue of the aforesaid deeds conveying the same to her as aforesaid; and also by virtue of the grant contained in Sections 643 and 644 of the said General Statutes of the State of Florida, if she was not already so vested, and the island aforesaid, which was formed on her submerged land, became her property and enured to her benefit because of her ownership of said Lot One, the riparian rights incident thereto, and the sub-

merged land contiguous thereto, as aforesaid; that under and by virtue of an act of the legislature of the State of Florida, known as Chapter 6451, approved June 5 1913, the aforesaid defendants as Trustees of the Internal Impovement Fund of the State of Florida, claim the title to and ownership of the aforesaid land and under the powers attempted therein to be granted to them, advertised as provided in said Chapter that on June 20, 1916, they would meet and consider selling said land, and asking in said advertisement for bids for said island; that pursuant to the provisions of the law embraced in the aforesaid Chapter 6451, your oratrix prepared and presented to said Trustees of the Internal Improvement Fund, her objections, which as presented, are attached to the original bill herein and made a part hereof, and the Trustees of the Internal Improvement Fund have overruled said objections and have accepted the bid of one Margaret Burlingame, and have sold said island to her, but have not yet delivered a deed to said island to her; that the aforesaid act of the Legislature of the State of Florida, known as Chapter 6451, approved June 5, 1913, is void and inoperative as to the aforesaid island or tract of land to vest in the said Trustees of the Internal Improvement Fund any title or power or right to sell said certain partially submerged island or tract of land, First: Because the provisions thereof cannot legally apply to the submerged land held, or formerly held by the State of Florida in trust for the people thereof so as to permit said Trustees to convert said land into individual ownership or sell the same so that it might be individually owned. Second: Because said land had been previously granted and under said grant became the property of your oratrix prior to the passage and approval of the aforesaid Chapter, and for other stated reasons not material here. Marg-

ret Burlingame is not made a party to the suit. It is also alleged that complainant is now filling in behind a bulkhead already erected in front of her said Lot One and other property and had intended to, and contracted for, the removel of dirt in said 'certain partially submerged island or tract of land' from its present location to the said fill, intending to do so because it is convenient and because in its present condition it has and does frequently catch and hold sediment from the Miami River and the sewers of Miami, which creates a stench obnoxious to your oratrix and her neighbors and is injurious to the health of the community; that under the provisions of the aforesaid Chapter 6451, the said Trustees will and they intend to, deliver a deed to the said Margaret Burlingame, and your oratrix alleges that the said deed to Margaret Burlingame, if executed and delivered, will constitute a cloud upon her title to the aforesaid certain partially submerged island or tract of land and incidentally upon Lot One of Block One Hundred and Three, South, and would confuse her title and rights, and the execution of said deed to Margaret Burlingame and delivery thereof would result in great and irreparable injury to your oratirx and her said title in that Margaret Burlingame is said to be a resident of Detroit, Michigan, and so far as your oratrix knows or is advised, owns no property in the State of Florida, and the necessary legal proceedings against her to remove the cloud on your oratrix' title if such a deed is delivered, would be productive of a multiplicity of suits in obtaining by suit against her in her own state satisfaction of a decree for costs in such suit to remove cloud, and in obtaining damages from her as a consequence of your oratrix being delayed in making her said fill and finishing her riparian improvements and for damages resultant to your oratrix because of encroachments

or your oratrix' rights and franchise, your oratrix alleging that said Margaret Burlingame is reported to be preparing to bulkhead and fill in around said certain partially submerged island or tract of land.

The prayer is that "a temporary restraining order may be issued enjoining and restraining the defendants aforesaid, and each of them, their agents and servants, from delivering to the said Margaret Burlingame a deed to the above described island; that the aforesaid act of the legislature known as Chapter 6451, be declared null, void and inoperative to vest in the Trustees of the Internal Improvement Fund any title or power as to the aforesaid certain partially submerged island or tract of land or the submerged land contiguous to said Lot One and belonging to your oratrix; that the said defendants may be enjoined and restrained from in any way clouding and confusing the title of your oratrix to the above described certain partially submerged island or tract of land, and the said submerged land; that the title to said island and the said submerged land be decreed to be in your oratrix; that the claim of the said Trustees of the Internal Improvement Fund as to said submerged land and said island or tract of land be decreed to be null and void; that upon a final hearing of this cause the said temporary restraining order may be made permanent and that your oratrix may have such good and further relief as to the court may seem proper."

A demurrer was interposed by the defendant Trustees on grounds that the bill of complaint does not make a case for equitable relief; that the allegation as to ownership of the island is a legal conclusion that is negatived by the facts stated; that the allegations show the title to the island is in the Trustees or in the State by virtue of its

sovereignty; that the riparian act of 1856 does not apply to the island in controversy. This demurrer was sustained and the bill was dismissed. The complainant appealed.

The navigable waters in the State and the lands under such waters, including the shore or spaces between ordinary high and low water marks, are the property of the State or of the people of the State in their united or sovereign capacity. Such lands are not held for purposes of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the State for purposese of navigation, commerce, fishing and other useful purposes afforded by the waters thereon.

Where in an action for damages a plaintiff alleges injury to his property located in the beds of navigable waters of the State, he must show the lawfulness of the ownership asserted, since the acquisition of such property is not of common right, but depends upon proper legislation and authorized appropriate action duly taken thereunder. Symmes v. Prairie Pebble Phosphate Co., 64 Fla. 480, 60 South· Rep. 223. See also Merrill-Stevens Co. v. Durkee, 62 Fla. 459, 57 So. Rep. 352.

Under the common law of England the Crown in its sovereign capacity held the title to the beds of the navigable or tide waters, including the shore or space between high and low water marks, in trust for the people of the realm who had rights of navigation, commerce, fishing, bathing and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies in America.

After the Revolution resulting in the independence of the American States, title to the beds of all waters, navi-

gable in fact, whether tide or fresh, was held by the States in which they were located in trust for all the people of the States respectively.

When the constitution of the United States became operative the several States continued to hold the title to the beds of all waters within their respective borders that were navigable in fact without reference to the tides of the sea, not for the purposes of disposition to individual ownerships, but such title was held in trust for all the people of the State respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the States under the Federal constitution.   The rights of the people of the States in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing and other easements allowed by law.   These These rights are designed to promote the general welfare and are subject to lawful regulation by the States and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guarantees of private property rights .

The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States.   For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means, grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the States respectively of the control and regulation of the uses afforded by the land and the waters,

or so as to interfere with the lawful authority of Congress.    See 62 Fla: 549; Clement v. Watson, 63 Fla. 109, 58 South. Rep. 25.

New States, including Florida, admitted "into the Union on equal footing with the original States, in all respects whatsoever," have the same rights, prerogatives and duties with respect to the navigable waters of the lands thereunder within their borders as have the original thirteen States of the American Union. Among these prerogatives are the right and duty of the States to own and hold the lands under navigable waters for the benefit of the people, as such prerogatives are as essential to the sovereignty, to the complete exercise of the police power and to the welfare of the people of the new States as of the original States of the Union.

The provision in the act of Congress of March 3rd, 1845, admitting Florida into the Union "on the express condition that (the state) shall never interfere with the primary disposal of the public lands lying within," the State, has reference to lands within the territorial limits of the State, the title to which was in the United States for its own purposes, as distinguished from lands held in trust for the people such as lands under navigable waters which passed to the State in its sovereign capacity to be held by it in trust for the people thereof, for the public purposes authorized by law subject to the power of Congress under the Federal Constitution.

At common law those who own land extending to the ordinary high water mark of navigable waters are riparian holders who, by implication of law, and in addition to the rights of navigation, commerce, fishing, boating, etc., common to the public, have in general certain special

rights in the use of the waters opposite their holdings, among them being the right of access from the water to the riparian land and such other rights as are allowed by law. Ferry Pass Inspectors & Shippers Assn., v. White's River Inspectors & Shippers' Assn., 57 Fla. 399, 48 South. Rep. 643; Merrill-Stevens Co· v. Durkee, 62 Fla. 549, 57 South. Rep. 428; Thiesen v. Gulf F. & A. Ry. Co., 75 Fla. 28, 78 South. Rep. 491; text 502. These special rights are easements incident to the riparian holdings and are property rights that may be regulated by law, but may not be taken without just compensation and due process of law. The common law riparian rights that arise by implication of law give no title to the land under navigable waters except such as may be lawfully acquired by accretion, reliction and other similar rights. Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. Rep. 353, Shively v. Bowlby, 152, U. S. 1; 14 Sup. Ct. Rep. 548.

In addition to the common law riparian rights in navigable waters, the lawmaking power of the State may grant to riparian proprietors owning to high water mark on the navigable waters of the State, easements in the lands below high water mark contiguous to the riparian holdings, for the purpose of constructing thereon facilities for reaching navigable water that may be opposite or in front of the uplands, with rights of action to protect the easements granted against unlawful intrusion or trespass by other private parties; provided such facilities do not materially impair the rights of the public in the navigable waters· Like common law riparian rights such granted easements when effective are secured by organic provisions for the protection of private private property rights, subject to the authority of Congress as to navigation.

But such granted easements and rights give no title to islands or to lands below high water mark.

Private ownership of lands riparian to navigable watters in this State extends ordinarily to high water mark. This appears to be the rule of the civil law as well as of the common law. Thieson v. Gulf, F. & A. Ry. Co., *Supra;* United States v. Pacheco, 2 Wall. (U. S.) 587; Cogburn v. San Mateo County, 75 Fed. Rep. 520; 4 Am. St. Papers, (Duff Green Ed.) 119; Hagan v. Campbell, 8 Porter, (Ala.) 9, 33 Am. Dec. 267; Jones v. Martin, 35 Fed. 348; 58 Fla. 398.

After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the constitution and laws of the United States. The lands under navigable waters including the shores were held by the United States for the benefit of the whole people to go to the future State for the use of the whole people of the State; and the State holds title for the purposes of the people of the State.

The shores of a navigable river are the spaces between high and low water marks, and the bed of the river includes the shores. Tide land is that which is daily covered and uncovered by water by the ordinary ebb and flow of normal tides. State *ex rel.* Ellis v. Gerbing, *supra.* See also Clement v. Watson, 63 Fla. 109, 58 So. Rep. 25.

A demurrer in equity does not admit legal conclusions asserted in the bill of complaint, or conclusions of fact not justified by the facts alleged, or assertions of ultimate facts that are not sustained by the facts alleged. See Dillon v. Barnard, 21 Wall. (U. S.) 430; United States v. Ames, 99 U. S. 35; Louisville & N. R. Co. v. Palmes, 109

U. S. 244, 3 Sup. Ct. Rep. 193; Hitchcock v. Buchanan, 105 U. S. 416; Pennie v. Reis, 132 U. S. 464, 10 Sup· Ct. Rep. 149; Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S. 569, 11 Sup. Ct. Rep· 656.   This is particularly so when the right asserted as a conclusion of law or of fact dependes upon unusual provisions of law and proceedings thereunder and no such provisions and proceedings are made to appear.   Kansas v. Colorado, 185 U. S. 125, 22 Sup. Ct. Rep. 552; Symmes v. Prairie Pebble Phosphate Co., 64 Fla· 480, 60 So. Rep. 223; Brown v. Avery, 63 Fla. 355, 58 So. Rep. 34.   Even if in this State lands below high water mark may be the subject of private ownership, such a right would be a most unusual and extraordinary one that should be particularly shown when claimed in a suit.

It is a settled law in this State that private ownership of lands bordering on navigable waters extends only to high water mark.   If under valid Spanish grants or otherwise private ownership is claimed in lands below the high water mark, the source and authority for such claimed ownership should be made to appear by proper allegations and exhibits or by reference to matters of which judicial notice is taken.   Since under the Spanish law as well as under the law of this State private ownership of uplands stops at high water mark on navigable waters, except perhaps, under special and particular provisions and action of sovereign governmental authority, those claiming ownership below high water mark must show the sources and muniments of title from competent authority to make such a grant against the rights of the public in the shores of waters of navigable waters in this State. See Sullivan v. Richardson, 33 Fla. 1, 14, So. Rep. 692;

Mayor & Aldermen of City of Mobile v. Enslave, 9 Porter, (Ala.) 577, 16 Pet. (U. S.) 234, 10 L. Ed. 948.

In order to have rights under the riparian act of 1856, the complainant must own to low water mark. Thiesen v. Gulf, F. & A. Ry Co., *Supra;* Secs. 643, 644, Gen. Stats· 1906, Compiled Laws, 1914. Even if the allegation that the complainant's upland lot extends "to the low water of Biscayne Bay, an arm of the Atlantic Ocean and a navigable body of water," can be regarded as an allegation that the lot is "actually bounded by and extends to low water mark," within the terms of the Act of 1856, such allegation is not admitted by a demurrer to be true, since it is contrary to general law and is not sustained by, but is inconsistent with other specific allegations and the exhibits to the bill.

By "Treaty of Amity, Settlement and Limits between the United States of America and His Catholic Majesty, the King of Spain, concluded February 22, 1819, ratifications exchanged at Washington, D. C., U. S. A., February 22, 1821, proclaimed February 22, 1821," it is provided that "His Catholic Majesty cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the eastward of the Mississippi, known by the name of East and West Florida. The adjacent islands depend on said provinces, all public edifices, fortifications, barracks and other buildings, which are not private property, archives and documents, which relate directly to the property and sovereignty of said provinces, are included in this article. The said archives and documents shall be left in possession of the commissaries or officers of the United States, duly authorized to receive them" and that "all the grants of land made before the 24th of January,

1818, by His Catholic Majesty, or by his lawful authorities, in the said territories ceded by His Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands, to the same extenst that the same grants would be valid if the territories had remained under the dominion of His Catholic Majesty. But the owners in posession of such lands, who, by reason of the recent circumstances of the Spanish nation, and the revolutions in Europe, have been prevented from fulfilling all the conditions of their grants, shall complete them within the terms limited in the same, respectively, from the date of this treaty in default of which the said grants shall be null and void. All grants made since the said 24th of January, 1818, when the first proposal, on the part of His Catholic Majesty, for the cession of the Floridas was made, are hereby declared and agreed to be null and void." Articles 2 and 8 of Treaty as shown by Fuller's Purchase of Florida, 1776-1819; State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 47 So. Rep. 353.

Subsequent to the Treaty of February 22, 1819, by which Spain ceded to the United States the territories known as East and West Florida, various Acts of Congress were passed for settling private land claims in the ceded territories, pursuant to the above quoted provision of Article 8 of the Treaty providing that "all grants of land made before the 24th of January, 1818, * * * in said territories * * * shall be ratified, and confirmed to the persons in possession of the lands to the same extent that the same grants would be valid if the territories had remained under the dominion of" Spain.

The titles to the land were to be "ratified and confirmed to the persons in possession of the lands." American State Papers, Volume 4, 273 shows that an application of

Mrs. Hagan for "confirmation of title to 640 acres of land situated on the South side of the Miami River, near Cape Florida" was filed with the commissioners appointed to adjust private land claims under the above mentioned Acts of Congress. On page 284 of the same volume, it appears the claim of "Mrs. Hagan to 640 acres, South Miami River, Cape Florida, occupation and cultivation from 1810 to 1825," was presented for confirmation. On page 301 of the same volume, it appears that the claim of "Mrs. Hagan's six hundred and forty acres, River Miami, near Cape Florida," was approved.

By Act of Congress, February 8th, 1827, titles to lands reported by the Commissioners for action were confirmed, and provision was made in the Act of Congress for a survey of the lands and for the issuance of patents to the claimants for the lands confirmed to them. No executed paper title from Spain or from the nited States is shown. The conveyances to the complainant in 1874 and 1896 describe the property as "six hundred and forty acres of land on the South side of Miami River, near Cape Florida, known as a donation to Mrs. Rebecca Hagan by the United States Government" and as "all of the Mrs. Hagan Donation known as Section thirty-eight (38), in Township Fifty Four (54), South of Range Forty-one (41) and Forty-two (42) East," and as "all that tract of land lying in Dade County, Florida, and known as the Mrs. Hagan Donation on the South side of Miami River on Biscayne Bay." There is nothing in the muniments of the title to indicate an intent to cover or include land below high water mark, the usual limit of private riparian ownership.

By the civil law of Spain the shore extended to high water mark, and the waters and land below high water

mark were common to all the people of the realm; and particular private rights therein could be granted, if at all, only by special concession of the King.   See Sullivan v. Richardson, 33 Fla. 1, 14 So. Rep. 692; White's Spanish Laws, 62.

Mrs. Hagan's claim of title was predicated upon "occupation and cultivation," prior to January 24, 1818, and the confirmation of title by Congress pursuant to Article 8 of the Treaty of Cession.   Complainant does not show a title covering or including land below high water mark; but alleges that her title was subject to the trust under which the land was held by the State of Florida prior to December 27, 1856, when the riparian act was passed.

If the land below high water mark was held by the State in trust for the people of the State, prior to the Act of 1856, it is so held now, since the Act of 1856, only grants an easement to certain riparian proprietors "owning lands actually bounded by and extending to low water mark."

It does not appear that "Mrs. Hagan's Donation" or grant extended below high water mark under the civil law of Spain or under the common law.   After the Floridas were ceded to the United States the common law controlled the rights of riparian owners.   When Florida became a State in 1845, it assumed the title to all lands under navigable waters in the State below high water mark; and this did not violate any rights of Mrs. Hagan or her successors in title to the land in controversy as Mrs. Hagan then had no title below high water mark.   The complainant has no better right than her predecessors in title had in lands below high water mark.

Even if the complainant's upland lot extended to low water mark on the navigable bay, it does not follow that such ownership carries with it ownership of the island under the facts in this case. As the complainant's ownership of the island does not appear, she is not in a position to complain of the acts of the Trustees, who are State officers, with reference to the island.

In suits for the removal of clouds from title as a general rule, an allegation in the bill that complainant is the owner in fee of the lands in question, and in the actual possession thereof, or that the lands are wild, unimproved or unoccupied, if such be the case, is sufficient, without setting out in detail the facts showing such ownership, as ownership is the ultimate fact and the others are mere evidentiary facts. If, however, in addition to an allegation of ownership in fee, the facts which constitute the title, of whatsoever nature they may be, are also set out, and such facts show title not to be in the complainant, a demurrer to the bill will lie. West Coast Lumber Co. v. Griffin, 54 Fla. 621, 45 So. Rep. 514; United States v. Des Mones Nav.& Ry. Co., 142 U. S. 510, 12 Sup. Ct. Rep. 308; 17 Enc. Pl. & Pr. 327; 32 Cyc. 1351, 73 So. Rep. 795.

In suits of this nature the complainant must show with clearness, accuracy and certainty the validity of her own title and the invalidity of the claim or act of the opposing party; and she must rest upon the strength of her own title and not upon the lack of right in the opposing party; and she must show documentary title or title by adverse possession and that she is actually or constructively in possession of the lands, or at least that the opposing party is not in possession. Trustees I. I. F. of Florida v. Gleason, 39 Fla. 771, 23 So· Rep. 539; Morgan v. Dunwoody, 66 Fla. 522; 63 So. Rep. 905;

Baltzell v. McKinnon, 57 Fla. 355, 49 So. Rep. 546; Hill v DaCosta, 65 Fla. 371, 61 So. Rep. 750; Peninsular Naval Stores Co., v. Cox, 57 Fla. 505, 49 So. Rep. 191; Reid v. Grantham, 65 Fla. 500, 62 So. Rep. 480.

It does not appear that complainant succeeds to the title of Mrs. Hagan, or that the conveyances of the land to complainant were made by parties who were in possession or who could convey title. The mere allegation that complainant owns the upland to low dater mark is insufficient as against the State when the muniments of the title shown by complainant do not connect her title with Mrs. Hagan's Spanish grant title, and there is nothing except the mere assertion of ownership to show complainant owns to low water mark. Private ownership under the civil law of Spain and under common law extends only to high water mark except under special circumstances and no such circumstances are shown here. Complainant alleges that prior to 1856, the submerged lands were held by the State in trust for the people of the State, and the Act of 1856, gives no rights execpt easements to those who own to low water mark, and complainant makes no showing that she owns to low water mark. A mere assertion of ownership of submerged lands, the title to which is held by the State in trust for the people of the State is insufficient to show such ownership and such assertion is not admitted by the demurrer since it is inconsistent with the facts alleged and with the law of the case. It does not at all appear that the complainant is in possesion of the island or that it is unoccupied or that it is not in the possession of the defendants. Even if complainant is the owner of the submerged lands below high water mark, neither the civil law of Spain, nor the common law, nor the act of 1856, gives her title to the is-

land.   The Act of 1856 gives merely an easement to wharf out or to fill in to the edge of the channel, and it appears that a channel existed between complainant's upland and the island before complainant began to fill in the space in the water in front of her riparian land.   State v. Black River Phosphate Co. 32 Fla. 82, 13 So. Rep. 640; Panama Ice & Fish Co. v. Atlanta & St· A. B. R. Co., 71 Fla. 419, 71 So. Rep. 608.   Easements under the Act of 1856 give no title to islands or lands below high water mark in navigable waters of the State.   Land does not pass as appurtenant to land.   Rivas and Koopman v. Solary, 18 Fla. 122; Lord v. Curry, 71 Fla. 68, 71 So. Rep. 21·   Title as againts the public cannot be acquired by adverse possession.   See Bass v. Ramos, 58 Fla. 161, 50 So. Rep. 945; 1 R. C. L. 740.   The general rights of the public in navigable waters opposite riparian holdings continue until wharves are .constructed under lawful authority.   32 Fla. 82, text page 111.

If the formation of the island referred to was authorized by law for the benefit of navigation and commerce the complainant has not title thereto, and no justifiable right therein.   Her common law riparian rights do not appear to have been thereby violated.   If complainant is entitled to rights under the Act of 1856, such rights do not give title to the island and it appears there is navigable water between complainants land and the island, and complainant had not wharfed out over the space now an artificial island, if lawful to do so, to reach the edge of the channel that originally existed in front of complainant's riparian holdings but beyond the space now covered by the island.   If the island was illegally formed, the complainant is not specially injured thereby since she has no title to the land and there is navigable water

between the complainant's land and the island, to which navigable water complainant has access from her upland, with all the rights accorded her by law as a riparian owner.

Decree affifmed.

BROWNE, C. J., AND TAYLOR AND ELLIS, JJ., AND WILLS, CIRCUIT JUDGE, concur.

WEST, J., disqualified.