SWANN, Judge.
The appellant, Paul L. E. Helliwell, was the plaintiff below. The appellees, The State of Florida and The Trustees of the Internal Improvement Fund of Florida, were the defendants.
The plaintiff filed a suit to quiet title to an area containing approximately 62.36 acres of partially submerged land in Biscayne Bay, consisting of “salt marsh and mangrove fiáis”, lying west and north of Mashta Island, in Dade County, Florida. This land will be referred to herein as “Mashta flats”. The plaintiff claimed that fee simple title to these flats was (1) included in mesne conveyances from the defendants to his predecessors in title, and (2) that title became vested in his predecessors under and by virtue of the Riparian Act of 1856.
The defendants’ answer denied these allegations and alleged that “Mashta flats” was sovereign land, covered by the waters *287 of Biscayne Bay at high tide; that the defendants had not sold or conveyed the land in question to anyone; and counterclaimed for a decree adjudicating the land to be sovereign in character and owned by the State of Florida in fee simple.
Both parties consented to the appointment of a Special Master. The Honorable Richard H. Hunt was appointed, conducted numerous hearings and filed his reports, which were confirmed and adopted by the chancellor. The plaintiff appeals the final decree declaring the fee simple title to the land in question to be vested in the State of Florida.
The reports of the Special Master contained, in part, the following:
******
“Mr. Matheson testified that the offshore flats or submerged lands claimed by plaintiff are covered over with water at high tide, although at low tide one or more spots of sand bar emerge from the water. His testimony generally corresponded with that given by other witnesses in establishing that the submerged area sought by plaintiff is covered by water and generally navigable by small craft at high tide.
“At the second hearing, plaintiff called as a witness one John M. Arribas, a civil engineer who recently conducted test borings on and near the lands in suit to determine the types and characteristics of soil and other material which underlie the water bottoms in question, as well as the type and character of soil to be found under the nearby upland and improved land area; and to give opinion evidence as to the differences found to exist, viz., the type of soil and land structure under the bay bottom and that under the surface of the adjoining land area.
“This witness testified that the borings established that the same soil and rock structures existed in each spot tested (see markings made on plaintiff’s exhibit 32), except that organic matter, being the remnants of decomposed mangrove trees, roots and weeds, were removed from the three bore holes which were sunk on the upland spots, whereas no such organic material came up from the marginal water borings.
“This tends to support other testimony in the case that the submerged lands sought by plaintiff have always been unobstructed tidal waters of the main body of Biscayne Bay and have never been marsh or swamp in character, or within the mangrove uplands area which long since has been filled and bulkheaded at the point in question.
“This witness also testified that the aqueous area in suit was completely covered by water at high tide when the bore tests were in progress.”
******
“1. Plaintiff’s title derives from (a) deed dated October 19, 1895, from Trustees of the Internal Improvement Fund of the State of Florida to Waters S. Davis, shown as Entry No. 29 in the abstract of title in evidence, conveying lands on Key Biscayne described as Sections 4, 5, 6, 8 and 9, ‘including Salt Marsh and Mangrove Flats’. Later on, upon application of attorneys representing plaintiff’s predecessor in title, the Trustees of the Internal Improvement Fund granted a second or amended deed to The Biscayne Company on behalf of the Matheson interests, dated May 9, 1922, which conveyed to the said title owner ‘All of Section 6 * * * according to plat of J. E. Hilgard’. (Emphasis supplied)
“The aforesaid deeds are in the record as plaintiff’s exhibits 1 and 2, respectively.
“The.plat of J. E. Hilgard was established as of 1870 (defendants’ exhibit 1) and shows as ‘S. W. Point’, the area involved in this suit. Attached to said *288 plat, as defendants’ exhibit 3, is a communication from the U. S. General Land Office, Department of the Interior, to the Commissioner of Agriculture at Tallahassee, which reflects that 24 acres of land existed in Section 6, of which the point of land known as ‘S. W. Point’ which forms the subject matter of this suit under the name of Mashta Island, comprised a portion of said 24-acre estimate.
“Prior to the 1870 survey by Hilgard, a certified state survey made in 1847 (in the record as defendants’ exhibit 2) shows areas of 'saw palmetto land’ and describes almost the entire western half of Biscayne Key as ''salt marsh and mangrove flats’.
“It is significant that the general outline and contour of the S. W. Point area is clearly depicted in this survey and does not appear to include the bay bottom area now claimed by plaintiff in this action.
“Defendants’ exhibit 6 is a chart of the Florida Reefs published by the federal government in 1856 and shows 'S. W. Point’ almost exactly as said area appears in the I-Iilgard map of 1870.
“Defendants’ exhibits 7 and 8 are U. S. Coast and Geodetic Survey charts of 1861 and 1878, respectively, and show 'coral banks covered with sand’ in the marginal off-shore sections of Key Biscayne. These charts essentially show the same ‘S. W. Point’ area and outlying bay bottoms which line the entire western side of Biscayne Key in varying depths and distances. Without clear evidence to the contrary, the master is convinced without any doubt that the shoal area claimed by plaintiff falls in the same classification as other off-shore shallow water areas touching the western side of Biscayne Key, which waters are navigable and at high tide completely cover the occasional shallow bars lying in the bay offshore from the uplands.
“Defendants’ exhibits 9, 10 and 11 are charts published by the federal government in 1892,1907 and 1919, respectively, and each carries out the similarity of contours and location of said ‘S. W. Point’ as has above been noted to exist from the very first chart of record.
“Defendants’ exhibit 13 is a U. S. Coast and Geodetic topographic map made from air photographs and which shows ‘S. W. Point’ after filling and improvement by plaintiff’s predecessor in title. As of this time, a virtual ‘hook’ had been dredged and constructed into the bay at the end of the point for the formation of a boat basin and erection of a two-story residence structure. The ‘shoal area’ continues to be shown as such, as do other similar areas lying along the same shoreline.
“Defendants’ exhibit 22 is a U. S. Coast and Geodetic Survey chart of 1961 which shows the present contours and depths of the area in suit, and except for the ‘hook’ above mentioned, the area depicted and denoted as ‘S. W. Point’ remains as it has been consistently shown by all charts and maps since the survey of 1847, which was followed by the Hilgard plat of 1870, as above set forth.
“Certainly so far as the outlying shoal area is concerned, it exists in common, and similar to, other bottom lands of the same character which line the western bank of Biscayne Key and all of which are covered by waters of the sea at high tide.
“The master is convinced from the evidence that the lands claimed by plaintiff in this action have never had the characteristics or classification, nor were they intended to have the characteristics or classification, of ‘salt marsh and mangrove flats’. The master is further convinced that the words ‘salt marsh and mangrove flats’ in the deed to plaintiff’s predecessor in title in 1895 had reference to salt marsh and mangrove flats of the *289 character shown in the plats of that day (defendants’ exhibit 2 — 1847), and that the terminology thus employed was not intended to include or cover, and did not in fact include or cover, any part or portion of the off-shore bay bottoms for which the plaintiff contends in this action.” (Emphasis supplied)
* * * * * *
"At the hearing of oral arguments on January 4, 1965, counsel for plaintiff contended that the Riparian Act of 1856 vested his predecessors in title, and hence himself, with full and irrevocable title to the bay bottoms in question, and that having so vested, the validity and integrity of the grant continues in full force and effect.
“Plaintiff admits that these submerged lands have not been improved by the construction of wharves, by filling or erection of any structure between the shore and the channel.
“The Riparian Act of 1856 was amended by the Butler Act of 1921, otherwise referred to as Ch. 8537, Acts of 1921.
“In 1957, Ch. 57-362 was enacted, and by this Act the Legislature repealed the 1921 Butler Act and vested the State’s title to lands of this character in the Trustees of the Internal Improvement Fund. Hence, the unused provisional or conditional grants to upland owners under the aforesaid Riparian Acts were effectively withdrawn by the State and eliminated by force of the aforesaid 1957 Act.
“This contention of plaintiff, therefore, is rej ected and denied upon authority of the following cases:
“State v. Black River Phosphate Company, 32 Fla. 82, 13 So. 640 [21 L.R.A. 189] (1893); “Panama [City] Ice and Fish Company v. Atlantic and St. Andrews Bay Railroad Company, 71 Fla. 419, 71 So. 608 (1916);
“Brickell v. Trammel [Trammell], 77 Fla. 544, 82 So. 221 (1919);
“State ex rel. Buford, Attorney General, v. City of Tampa, 88 Fla. 196, 102 So. 336 (1924);
“Williams v. Guthrie, 102 Fla. 1047, 137 So. 682 (1931);
“Bridgehead Land Company [for Use and Benefit of River’s Edge] v. Hale, 145 Fla. 389, 199 So. 361 (1941);
“Hayes v. Bowman, 91 So.2d 795 ([Fla.] 1957);
“Stafford B. Beach, et al., v. City of West Palm Beach and Trustees of the Internal Improvement Fund, 146 So.2d 586 [Fla.App.].” (Emphasis supplied)
* * * * * *
In the case of State ex rel. Ellis v. Gerbing, 1908, 56 Fla. 603, 47 So. 353, 22 L.R.A., N.S., 337, the Court held that lands within the limits of the state of Florida that are covered and uncovered by the ordinary daily tides of public navigable waters are shore or tide lands, and the title to them is held by the state, because of its sovereignty, under its admission into the Union.
We find that there was competent substantial evidence in the record to sustain a decree that the land was sovereign in character, belonging to the State of Florida, with title vested in the defendants, Trustees of the Internal Improvement Fund of the State of Florida.
We see no reason to add to the “rivers of ink” which have been written on this subject. The final decree is therefore
Affirmed.