W. W. MARSHALL and wife, DELLA N. MARSHALL, *Appellants*, vs. VIOLA HARTMAN, *Appellee*.

139 So. 441.

Division A.

Opinion filed February 1, 1932.

Petition for rehearing denied March 15, 1932.

144

*Sholtz, Green & West* and *L'Engle & Shands*, Attorneys for Appellants;

*Scarlett, Jordan, Futch & Fielding*, for Appellee.

BROWN, J.—Viola Hartman, an unmarried woman, residing in New York, on May 30, 1927, exhibited her bill of

complaint against W. W. Marshall and wife, residents of Volusia County, Florida, for the rescission and cancellation of a certain contract, dated November 2, 1925, evidencing the purchase by her from Marshall of described real estate in Daytona Beach, the purchase price being $150,000., $25,000. cash and the remainder payable $2,500. every six months thereafter with interest, and for the recovery of what she had paid on said contract less rents collected by her during the period of about eighteen months since the execution of the contract. The gravamen of the bill was that the execution of the contract had been secured by Marshall's falsely representing that the land had riparian rights, which representation was alleged to have been a very material one, and that the contract itself called for riparian rights, whereas complainant had thereafter, in April, 1927, discovered that the property had no riparian rights appurtenant thereto. The defendants answered the bill, denying that any such representation had been made, or that the contract obligated them to convey any title or rights other than such title or rights as defendants had, as shown by an abstract of the title furnished to complainant when the contract was made, and alleged that defendants had never assumed or claimed that the property had any riparian rights; that the words "and riparian rights" were embraced in the contract merely to make the contract correspond to the deeds by which Marshall had acquired title to the property. By way of affirmative relief, defendants prayed that complainant be required to specifically perform the contract. Upon final hearing on pleadings and proof the circuit court rendered a decree as prayed for by complainant, cancelling the contract and ordering that the defendants pay the complainants $49,831.01, and that in default of payment the property be sold to satisfy the amount so found to be due. From such decree appeal with supersedeas was taken to this court.

In all the negotiations with reference to the purchase of the property and the execution of the contract, and all that transpired thereafter, the complainant was represented by her brother, Albert Hartman, who was her agent and attorney-in-fact, with whom she was associated in the warehouse business in New York City. The complainant herself never came to Florida. The entire transaction was handled for her by her brother.

Albert Hartman visited Daytona Beach for ten or twelve days in the latter part of July, 1925. He says he made the trip to recuperate from an attack of illness, and also with the idea of securing a good location for a concentration warehouse, with riparian rights, to which he could "barge in" freight; there being in existence at that time the embargo on railroad freight shipments South of Jacksonville. Soon after his arrival in Daytona Beach, he called on a Mr. Levenstein, an acquaintance of his who ran a shoe store on Beach Street, but who was also in the real estate business. He told Levenstein of his desire to buy such a warehouse site with riparian rights, and engaged Levenstein to help him buy a piece of property suitable for this purpose. Levenstein called in a Mr. Gille, a real estate broker, who, Levenstein says, told him that he had a piece of property on Beach Street, belonging to Mr. Marshall, which had riparian rights, and which would suit him. Levenstein testified that he knew there was some property fronting on Beach Street which had riparian rights and some which had not. Gille is referred to by Hartman and Levenstein as Marshall's agent, though Hartman paid him a commission; but it appears from Marshall's testimony that before leaving for Vermont for the summer, he had engaged Gille to collect for him the rents as they fell due on this property, and gave him a "probable" sales price of $150,000. The property was shown to Hartman, who inspected it several times. It had a frontage of 150 on Beach Street, and a depth of 350 feet, running

back in a somewhat irregular shape to Daytona Street, on which latter street it had a frontage of 80 feet. There were five stores located on the property, fronting on Beach Street, which was a paved street 50 or 60 feet wide, running in a Northerly and Southerly direction, parallel with the Halifax River, a wide, navigable body of water. The property in question was located on the West side of Beach Street. Across Beach Street, on the East side, there was a strip of recently filled in land, about 150 to 200 feet wide, between the street and the River, running for some distance North and South. Hartman appears to have assumed, without asking any questions, that the portion of this land between the East side of Beach Street and the River, opposite the Marshall property, constituted "riparian rights," appurtenant to, and which went with, the Marshall property. Gille, he says, had told him that the property had riparian rights. Gille denied this, but said that he said no more than that the abstract stated that riparian rights went with the property; that "this was of record with the title to that property, whatever that amounts to." That he never told Hartman or Levenstein that Marshall had any title to any land lying East of Beach Street; and that he also told Hartman that the city claimed the land East of Beach Street, and had ordered all structures thereon to be removed and was not permitting any others to be erected.

Hartman testified further that he knew nothing of the previous history of the property and relied on Gille's representation without investigation or legal advice. But he must have known that the land he was buying was all located on the West side of Beach Street, and even though he may have honestly believed that the land he was buying had riparian rights, the fact remains that by an inspection of the property (which he visited several times), he was confronted with the obvious fact that between the property he was buying and the River there was not only a public

street, but also 150 feet or more of land, recently filled in land, it is true, but land nevertheless. As land is not appurtenant to the land (Rivas v. Solary, 18 Fla. 122), and as riparian rights are not appurtenant to land which has no water boundary (45 C. J. 570 et seq.), all of which Hartman must be presumed to have known, this was enough to have put him upon inquiry. And if he had inquired he could easily have ascertained that the city had constructed a bulkhead and had filled in this and the remainder of the strip of land between the East edge of Beach Street and the River several months before Hartman's arrival, for the purpose of making it into a public water front park, and that the city claimed to be the absolute owner of the strip of land thus filled in. If, as Hartman testified, the property was worthless for the purpose for which he wanted it unless riparian rights went with it, it would seem that he would have made some investigation in view of the apparent physical facts above alluded to. It also appears from his testimony that he did not intend to build the warehouse on the River, as alleged in the bill, but on the property West of Beach Street on which the stores were located, and planned to remove the store buildings as soon as the leases expired to make room for the warehouse buildings. (page 96 of transcript.) Whether he was legally justified in so doing or not, even if we accord to Hartman sincerity in testifying that Gille gave him to understand that the property carried with it riparian rights, and that he believed him, in spite of the physical appearances to the contrary, there is no evidence that Marshall authorized or had knowledge of any such representation by Gille. Be that as it may, Hartman was evidently for some reason well pleased with the property, and quite eager to purchase it.

Gille communicated with Marshall by wire, and the latter fixed his price at $150,000.00, which Hartman accepted. Some sort of memorandum contract and a check

for $5,000.00, as a down payment, were forwarded to Marshall, in Vermont, but Marshall was in no hurry to sell. He refused to sign and returned the check, saying he preferred not to sign any papers or close the trade until he returned to Daytona Beach in October.

Hartman returned to New York about August 1st, 1925, but he was evidently very anxious to complete the purchase of the property as soon as possible. Early in September he went to see Marshall at his home in Vermont. He testified that Marshall put him through "the third degree," asking him a number of questions about himself, about what he wanted the property for, etc., and said that there was a small cloud on the property which could be cleared up for about $500.00; that he did not pay much attention to this, as he thought Marshall was trying to discourage him from buying. During the course of the conversation Hartman testified that he said to Marshall: "By the way, you have riparian rights with this property, haven't you," and that he said "yes." This apparently incidental reference to this (according to Hartman) all important feature of the matter, was all that was said on the subject in the course of the rather lengthy conference. In his testimony, Marshall positively denied making any such statement, and said that riparian rights was not in any way mentioned in the conversation, nor did he say anything about any cloud on the title; that he told Hartman that he would deliver the property "as was, — the same way I got it." Continuing his testimony, Hartman said that after they had talked for an hour or two, Marshall promised him that he would deliver the property when he got back to Daytona in October. Late in October, but before Marshall had arrived, Hartman went back to Daytona, and on November 1st he and Marshall met in Gille's office and talked over the terms of the contract, and on the next day Gille drew up the contract, getting the description from the two deeds under which Marshall

had acquired the property, each of which, immediately after the description of the property, included the words, "and riparian rights." However, the subject of riparian rights was not mentioned in the discussion at either of these two meetings. The contract as drawn up by Gille was read over and signed by both the parties, and by Mrs. Marshall, and duly acknowledged.

While the contract as signed contained the words "and riparian rights" immediately following the description of the property, it also contained the following significant paragraph:

"Party of the second part, and her attorney in fact, to accept title from parties of the first part, as abstract now shows same to be, and parties of the first part are not to be held responsible for any clouds, encumbrances or defects which may hereafter be found in said title and abstract prior to November second 1925. And the parties of the first part hereby certify that they have not encumbered said title up to the present date since their ownership of same, except to the extent of leases hereinafter mentioned."

This paragraph of the contract is in line with what Marshall testified that he had told Hartman, that is, that he would convey him, "Just what I owned; no more, no less."

Marshall delivered an abstract of title of the property to Hartman at the time of the execution and delivery of the contract, and such abstract presumably has remained in his possession and control, and although it was referred to in the contract, the abstract was not introduced in evidence.

Twenty-five thousand dollars was paid by Hartman to Marshall when the contract was executed on November 2, 1925, Hartman was given immediate possession of the property, and the installments of $2,500.00 of principal, with interest, falling due under the contract on May 2, 1926 and on November 2, 1926, were paid.

It appears from the bill and Hartman's testimony, that shortly before the installment of May 2, 1927, fell due, complainant applied to a mortgage and title insurance company for a policy insuring the title to the property described in the contract, and that about ten days later the company reported that it would not insure the title or any right in or to the riparian rights mentioned in the contract. Complainant then sought legal advice, and was advised by the attorneys employed that, in their opinion, at the time the agreement was made the defendants did not have any riparian rights appurtenant to or in any manner connected with the lands described in such agreement nor any power to convey the same, which the bill alleged to be true in law and fact. For this reason, so the bill alleges, Hartman, acting as usual for the complainant, on May 2, 1927, the day the third semi-annual payment fell due, notified Marshall in writing that he rescinded the contract, would not go forward with it, and demanded the return of all payments made less the net amount of rents and profits received by complainant.

The reasons alleged in the bill why Marshall did not have any riparian rights, were: (1) That when the lands, of which those here in question form a part, were subdivided and platted in 1876, Beach Street was dedicated by the owner for the use of the public as a public highway or street, and that the Eastern boundary of said street as so platted and dedicated was the waters of Halifax River, a navigable stream in which the tide ebbs and flows, and all the land East of the street was covered by the waters of the River; that the municipality accepted and the public has used the said street; (2) That for more than twenty-five years past the municipality of Daytona Beach (formerly Daytona) has "claimed and been in possession of" the entire water front opposite the said land, and has exercised "dominion" over the land (presumably submerged land we suppose) lying East of Beach Street opposite said

land; and that (3) when the contract was entered into, said municipality had recently bulkheaded and filled in a strip of land 150 to 200 feet wide immediately East of Beach Street, for park purposes, but that complainant did not know and was not informed that the city had done this and claimed to own said recently filled in land.

There was no proof that the city had exercised any dominion or possession over the submerged lands East of Beach Street opposite this property until the city bulkheaded and filled in for park purposes the strip East of the Street in the early part of the year 1925, but there was introduced in evidence a stipulation which amounted to proof of the allegations as to the platting of the property in 1876 and the dedication of the street for the use of the public as a street, the Eastern boundary of which was the waters of the navigable river, the public use and acceptance of the dedication by the municipality, and the filling in of the strip East of the street by the city and making it a park. The stipulation also sets forth that Beach Street "is now and has been for more than ten years last past owned by the City of Daytona, now Daytona Beach, but that such ownership is not a matter of record in the public records of Volusia County." Whether the parties intended by this last clause to mean that the city owned in the street not only an easement for street purposes but also the fee in the land on which the street was located, is not entirely clear.

The answer, in addition to what has already been indicated above alleged that on November 3rd, 1926, the defendants, at the request of complainant, executed a modification of the contract, which reduced the amount of the balance then due on the purchase price from $127,000.00 to $107,400.00, and a copy of the indenture making such reduction is attached as an Exhibit. In his testimony, Albert Hartman says this was done without his knowledge or authority, he being in Europe at the time. Complainant

did not herself testify in the case. The answer also alleged that during the year and a half that complainant was in possession, the value of the property, due to the general depreciation in values, had fallen from $150,000.00 to $75,-000.00.

It will be noted that complainant does not allege that none of the owners in the chain of title of the upland here involved ever had riparian rights, but the inference seems to be that such riparian rights appurtenant to the property, if any such ever existed, were lost or divested by the dedication and acceptance of the street along the water front and the filling in by the city of the submerged lands immediately East of the street.

Appellants contend that the evidence does not show any lawful divestiture of riparian rights, and that the bill does not claim that the city ever acquired the fee in the street; that the fact was the city only acquired an easement and hence no authority in the city is shown for filling in such submerged lands. Appellant cites the case of Smith v. Horn, 70 Fla. 484, 70 So. 435, which holds that where the owner of lands has it surveyed and platted into subdivisions, with spaces for intervening streets or highways clearly indicated on the plat, the owner thereby evinces an intention to dedicate an easement in such streets or highways to the public use, the title to the land under the street remaining in the owner or his grantees; and where conveyances are made with reference to the map or plat, the dedication of the easement for street purposes cannot consequently be revoked as against the grantees; that the title of the grantees to lots abutting on such streets, in the absence of a contrary showing, extends to the center of such streets, subject to the public easement. See also Kirkland v. City of Tampa, 75 Fla. 271, 78 So. 17; Rawls v. Tallahassee Hotel Co., 43 Fla. 288, 31 So. 237. However, this doctrine would not avail appellants anything, unless it could be extended so as to give the *grantee* of lots on

the upland side of a street, which street was bounded on the other side by a parallel body of navigable water, title to the fee in the street all the way across to the water boundary. But no authorities are cited to support this proposition. There might be added force to contend for such an extension of this doctrine where the deed also expressly purported to grant riparian rights on the opposite side of the street. If this doctrine could be so extended, there might be some ground for claiming that such a grantee had riparian rights. But this record does not require a decision of this point. The *original owner* who made the plat and who owned the fee to the highwater mark, might, under some very respectable authorities, be held to be thus vested with riparian rights, in spite of his dedication of a street along the waterfront of his property. Thus in section 66b of Farnham on Waters, p. 305, it is said: "The laying out of a highway along the shore, the title to the fee of which is in the public, will deprive the owner of the land abutting on the highway of his former riparian rights, but the highway will not have that effect if the fee of the street remains in the abutting owner." Citing Brooklyn v. Smith, 104 Ill., 429, 44 Am. Rep. 90. See also, to the same effect, 27 R. C. L. 1075, where other cases are cited. Where the fee to a street along a river front is in the abutting owner, the title to accretions will be in him. Farnham on Waters, Sec. 71a, p. 328; Banks v. Ogden, 2 Wall. 57, 17 Law ed. 818; Kinzie v. Winston, 56 Ill. 56. As bearing on this question, see City of Miami v. F. E. C. Ry. Co., 79 Fla. 539, 553, 84 So. 726. In Banks v. Ogden, *supra,* it was held that a grant of land bordering on a road or river carries the title to the center of the river or road, unless the terms or circumstances of the grant indicate a limitation of its extent by the exterior lines, and that where the fee of that half of a street bordering on a lake remained in the original proprietor, the title to accretions afterward made on this strip followed

the title to the land, and hence passed to such original proprietor's assignee in bankruptcy. This case in effect holds that riparian rights are vested in the owner of the fee in land having a water boundary, rather than in the owner of the easement. But in Farnham on Waters, sec. 144, p. 667, 668, it is said that the riparian rights of an abutting owner depend on his land touching the water, and if the fee in a highway separating his land from the water is in the public, the abutting owner has no riparian rights, and that whether the dedication carried the title or a mere easement will depend on the intent shown by the terms and manner of dedication. See also in this connection Brickell v. Ft. Lauderdale, 75 Fla. 622, 78 So. 681, and Axline v. Shaw, 35 Fla. 305, 17 So. 411. There is a distinction between the rights accruing from the dedication of a street running parallel with and bounded by the water, and one which runs to or terminates at the water. See Farnham on Waters, sec. 144a, p. 673, where it is said that as to a street running to the water, if the land is extended, even by natural accretions, the highway will follow the extension and continue to reach the water. In this connection see also Geiger v. Filor, 8 Fla. 325; Alden v. Pinney, 12 Fla. 348; Ruge v. Apalachicola, 25 Fla. 656, 6 So. 489; Rivas v. Solary, 18 Fla. 122; Sullivan v. Moreno, 19 Fla. 200; Thiesen v. G. F. & A. Ry. Co., 75 Fla. 28, 78 So. 491; Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Ferry Pass Association v. White River Association, 57 Fla. 399, 49 So. 643. In Panama I. & F. Co. v. Atlanta & St. Andrews Bay R. Co., 71 Fla. 419, 71 So. 608, it was held that a conveyance of lands to which riparian rights to submerged lands are attached under the statute, may carry the riparian rights unless such rights are reserved or a contrary intent appears from the statute. In 27 R. C. L., 1076, it is said: "It has been held that the owner of a piece of land on a navigable river, though a strip of such land along the river had become a public

street by a common law dedication, continues to be the riparian proprietor in respect of his ownership of the fee in the half of the street between the center and the river, even after he had conveyed the land, if the deed describes it as extending to the street.'' And it has been held by very respectable authorities that the grantees of the original owner of lots bounded on such a street take the ultimate fee only to the center of the street subject to the public easement, and acquire no riparian rights in the waters on the other side of such street. Demopolis v. Webb, 87 Ala. 659, 6 So. 408; note in 22 L. R. A. (N. S.) 674. See also Rivas v. Solary, *supra.*

But we do not deem it necessary, for reasons hereinafter stated, to determine the very interesting questions presented in connection with the contention of appellants that the complainant failed to prove that defendants did not have riparian rights. We might note in passing, however, that it appears to be conceded by counsel for appellee, Hartman, on page 47 of their brief that ''the record showed that Marshall did have riparian rights,'' and that Marshall agreed to convey what the record showed. If it be true that Marshall had acquired title to and was vested with the riparian rights in connection with or appurtenant to this property when the city filled in the submerged lands East of the street, there might be some question as to whether he was divested thereof by such unauthorized act of the city. The riparian rights act of 1921, chapter 8537 of the Laws of Florida, appears to give the right to fill in as far as the edge of the channel only to riparian proprietors. However, we consider that this question is eliminated from the case by the admissions in paragraph 6 of appellants' answer to the bill, in which it is said that ''complainant and/or her agent knew or ought to have known that the land recently filled in and lying East of Beach Street and in front of said property was a part of a public park constructed by the City of Daytona Beach

at its own expense and owned or claimed to be owned by it, in which these defendants neither had nor claimed to have any right, title, interest or claim."

The argument of counsel for appellee to the effect that the abstract shows riparian rights in the vendors, and since appellants are admittedly unable to convey such riparian rights, they cannot perform the contract, is not only somewhat contradictory, but it is not well founded, because the partial abstract which they introduced in evidence is not the abstract delivered with and referred to in the contract. The abstract introduced was prepared February 14, 1927, and runs back only to November 12, 1921, whereas the lots in suit and Beach Street were platted forty-five years before. Moreover, this partial abstract contains warning to intending purchasers that the lots in question might not have riparian rights, because it is replete with descriptions containing such words as, "together with such riparian rights as the grantors may have or hold in the Halifax River, if any." However, it appears that the deeds to Marshall, as above alluded to, were not so equivocal, except the one from Bridgman as to a part of the property. However that may be, the abstract before the court is not the abstract which was made a part of the contract, and it is therefore inadequate to prove that the abstract which was delivered with and made a part of the contract showed riparian rights in Marshall. It thus appears that appellee has failed either to plead or prove the complete contract.

As above shown, the contract provided that the vendee was to "accept title from parties of the first part as abstract now shows same to be," etc.

"The rule is that where it appears from the contract, or the circumstances accompanying it, that the parties had in mind merely such a conveyance as will pass all the title which the vendor had, whether defective or not, that is

all the vendee can insist upon.'' Morgan v. Eaton, 59 Fla. 562, 52 So. 305.

It would appear that in the light of all the circumstances and the language of the contract itself that the particular words, ''and riparian rights,'' as used in this contract, should be construed to either mean, ''and riparian rights, if any,'' or ''such riparian rights as are shown by the abstract.''

This newly made land, across the street from this property, could not have escaped the attention of any intelligent purchaser. Hartman's agent, Levenstein, admitted that he knew when Hartman inspected the property in July, 1925, that the city planned to make a park on this newly made land. The description of the land in the contract did not purport to show any water boundary. All these persons must have realized that the existence of riparian rights, if any, was very doubtful. Add to this the significant fact that the contract expressly provided that the vendee should take the title as shown by the abstract, and that the vendor should not be held for any defect in title prior to the date of the contract. In view of all this, the conclusion seems inescapable that the complainant had no just cause to rescind the contract upon the ground that upon investigation made about a year and a half after the contract was entered into, it was found the the property had no riparian rights.

Hartman must be presumed to have known what was in the abstract and what he could see with reference to the street and the newly made land between it and the river. James v. Gollnick, 100 Fla. 829, 130 So. 450; Leathers v. Orange Investment Co., 97 Fla. 278, 120 So. 329. In the latter case it was said by BUFORD, J.: ''If, after having the abstract in his possession, he accepted the title as he found it, he could not later plead that he had not examined the abstract, and therefore had not observed defects shown therein and thereupon asked for recission; but

he will be conclusively presumed to have accepted the title as he found it under the terms of his contract, there being no allegation of fraud or deception contained in the abstract so submitted.'' It was also said in that case that the purchaser could not complain of a shortage in the front footage which he had every opportunity to learn about before closing the transaction; though it was not necessary to decide the point, as no misrepresentation in that respect was shown. There is no showing in the present case that any fraud or deception was contained in the abstract. It was not shown that the abstract delivered to Hartman purported to cover any property East of the street, or that it showed any title to riparian rights. If there is any doubt as to what that abstract did contain, it must be resolved against appellee and in favor of appellant, because the burden was upon appellee to show what it did contain. This burden appellee failed to carry.

The only testimony that Marshall ever said that the property had ''riparian rights'' was that given by Hartman, which Marshall positively denied. It is not alleged or shown that the defendants made a single representation of *fact* which would justify the conclusion, as a matter of law, that these lots had riparian rights of any kind. The fact that according to the plat Beach Street was the Eastern boundary of the lots was undeniably known to both parties. Hartman testified that he knew the lots fronted on Beach Street, and he gave the exact measurement of the frontage of these lots on the abutting streets. Indeed, the record does not disclose any material fact within the knowledge of Marshall which was not also within the knowledge of Hartman, or which should have been within his knowledge, from his inspection of the premises and their surroundings and his examination of the abstract. This comes very near making Marshall's representation, if he ever made it, that the property had riparian rights, an expression of an opinion, or a conclu-

sion of law, rather than a statement of fact. Rogan v. Bank, 93 Ill. App. 39, 62 N. E. 834; Beall v. McGhee, 57 Ala. 438. But even if it be considered as a statement of fact, the prior negotiations were merged into the written contract, which, while containing riparian rights in the description, yet bound the purchaser to take title as the abstract showed the same to be.

Furthermore, the record is not very convincing that Marshall's alleged representation was relied on by Hartman or induced the execution of the contract. Hartman nowhere testifies that Marshall or any one else told him that he could build a warehouse, or dock, or erect any other structures East of Beach Street, or on the River. Hartman never asked for or received the opinion of Marshall or any one else as to whether he could erect a structure or passageway on the land East of Beach Street. And Hartman's testimony shows that he never once inquired as to who had filled in, or owned or claimed to own, the very obvious made land between the street and the river. Indeed, the testimony shows that Hartman intended to build the warehouse on the lots described in the contract on the West side of the Street, at first thinking to face it on Daytona Street, and Marshall suggested that he buy some of the property in the rear so as to give him a square lot. And although Hartman claimed that Marshall told him there was a slight cloud on the property, this did not deter Hartman at all; he never even inquired the nature of it, and appears to have acted on his own independent judgment. See Stokes vs. Victory Land Co., 5th headnote, 99 Fla. 795, 128 So. 408; Hancoy Holding Co. v. Lambright, 133 So. 631. The facts and circumstances shown by the record, raise more than a mild suspicion that Hartman's attempted rescission may have been motivated by something other than the absence of riparian rights, and that the allegations in the answer in regard to the fifty per cent. decrease in value of the property, during

the year and a half that elapsed from the time the contract was made in the roseate days of 1925 and the attempt to rescind it in the spring of 1927, while the period of deflation was on, were not entirely irrelevant, and should not have been stricken.

Furthermore, even if it should be conceded that Marshall represented to Hartman on his visit to Vermont that the property had riparian rights, it appears, that in view of the circumstances above noted the fact that the lots were to all appearances non-riparian, being separated from the water by a paved street and sidewalks, and an abstract having been delivered with the contract, with a clause in the contract that the purchaser would take title as shown by the abstract, that appellee was also guilty of such laches as would deny the relief prayed for in her bill. Geter v. Simmons, 57 Fla. 423, 49 So. 131; Dehuy v. Osborne, 96 Fla. 435, 118 So. 161; Foster v. Mansfield, 146 U. S. 88, 36 L. ed. 899. In view of all the facts and circumstances, as shown by the record, a delay of about a year and half, while such a drastic reduction in real estate values was in progress, was a considerable delay. In Foster v. Mansfield, *supra*, the U. S. Supreme Court said:

"The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

But aside from the question of delay or laches, we are inclined to hold that, for the reasons hereinabove given, the evidence in the case did not show that appellee was entitled to have the contract rescinded and cancelled on the ground of fraud. The testimony was not taken before the chancellor, but, giving all due weight to the chancellor's conclusions on the evidence, and admitting the diffi-

culty of the questions involved, we have reached the conclusion that the evidence is not legally sufficient to sustain the decree in favor of complainants.

We are also of the opinion that the court erred in sustaining the complainants' ninth, tenth and eleventh exceptions to defendants' answer. Our reasons are apparent from what has already been said. We might add that if the defendants could show by evidence that the contract was modified as alleged in the answer, it would have some bearing on their prayer for affirmative relief to enforce the contract as modified, and it might also have thrown some further light on the questions of waiver and laches on the part of complainant. The demurrer to the cross-bill portion of the answer was overruled, but the sustaining of the exceptions as to the modification of the contract placed the defendants in the position of suing for the enforcement of a contract which they claimed no longer existed.

On the evidence, the prayer of the bill should have been denied, and the cross-bill retained, with leave to amend if necessary.

The decree of the court below will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

BUFORD, C.J. AND ELLIS, J., concur.

WHITFIELD, P.J., AND TERRELL AND DAVIS, J.J., concur in the opinion and judgment.