ELLEN F. CAPLES, *et al.,* and FRED P. CONE, *et al.,* as Trustees of the Internal Improvement Fund of the State, v. E. P. TALIAFERRO, *et al.,* as Executors and Trustees under the Last Will and Testament of T. C. TALIAFERRO, Deceased.

197 So. 861
Opinion Filed March 8, 1940
On Rehearing October 1, 1940

*John F. Burket, George Couper Gibbs,* Attorney General, and *Marvin C. McIntosh,* Assistant Attorney General, for Appellants;

*M. B. Withers* and *Wm. M. Taliaferro,* for Appellees.

TERRELL, C. J.—In 1910 R. C. Caples acquired title to Blocks 1, 2 and 3, in Section 2, Township 36 South, Range 17 East, Sarasota County, otherwise platted and known as "Shell Beach." In 1926, Caples and his wife, Ellen F.

Caples, purchased and took deed from the Trustees of the Internal Improvement Fund to the submerged lands in front of the uplands so described. In 1927, R. C. Caples secured a loan from T. C. Taliaferro, which he secured with a mortgage on his uplands. In 1932, Taliaferro foreclosed his mortgage and secured a master's deed to said uplands.

This suit was instituted by appellees as complainants against appellants as defendants for the purpose of having complainants as holders of the uplands decreed to be riparian owners and thereby possessed of title to the submerged lands in front of said uplands and to have the deed to said submerged lands executed by the Trustees of the Internal Improvement Fund to the Caples to be decreed to be null and void.

The defendants answered the bill of complaint denying the material allegations thereof in so far as they made any claim to riparian ownership. They support their denial of riparian ownership with the allegation that they are the owners of a small strip of land averaging twenty-one feet in width and lying between the complainant's upland and Sarasota Bay designated as "Palm Walk." There was a final decree for the complainants and this appeal was prosecuted.

The first question we are required to answer is whether or not the mortgage deed from Caples to Taliaferro described and carried title to all lands to high water mark on Sarasota Bay and thereby made him a riparian owner with all the rights and privileges as such.

Appellees contend that this question should be answered in the affirmative because, (1) the mortgage deed makes no express reservation of the strip of land designated as "Palm Walk," (2) that when a street or highway is platted on the margin of the grantor's land, a conveyance of the lands

bordering the street carries the fee to the entire width of the street unless expressly reserved and (3) the conveyance of land abutting on a street, way, or highway carries the fee to the center of the street unless expressly reserved.

We find no quarrel with this contention; under a proper state of facts, it would serve appellees well but the facts in this case completely overcome it and invoke a different rule. The material facts are not in dispute. In the first place, Blocks 1, 2 and 3 were sold to Caples and he in turn mortgaged them to Taliaferro according to the plat of "Shell Beach" which showed the strip of land known as "Palm Walk" between Block 3 and high water mark on Sarasota Bay. If there had been other platted lands beyond "Palm Walk," there would be basis for appellee's contention but beyond it was the ocean or bay, the bottoms to which Caples had held a deed from the Trustees of the Internal Improvement Fund for more than one year when Taliaferro took his mortgage and "Palm Walk" separated these lands from the uplands.

The description of the lands conveyed shows no purpose whatever to convey any lands beyond "Palm Walk." It shows a conveyance of twenty-three acres according to the plat of "Shell Beach" including "all streets, alleys, and reserve space in all the above area." There are numerous streets, avenues, and reserve spaces in this area but it is bounded on one side by "Palm Walk," the whole of which is clearly beyond and no part of which is in or within the lands described. By description and by intent "Shell Beach" was as completely cut off from the submerged lands by "Palm Walk" as if it had been a river or mountain barrier.

Aside from this, another, and more conclusive reason for holding that there was no intent on the part of Caples to

make Taliaferro a riparian owner is that for many years, the law of Florida had authorized the Trustees of the Internal Improvement Fund to sell certain submerged lands, that many thousands of dollars had been realized from the sale of such lands, that the submerged lands in question had been classified and sold as being within the power of the Trustees to sell and that they had actually been sold by appellants long before this suit was brought and long before Talliaferro took his mortgage.

In the light of these facts, there was no reason whatever for an express reservation of the submerged lands in question in Talliaferro's mortgage and it is contrary to every impulse of human nature to assume that there was the remotest intent to convey the uplands held by appellees to high water mark. It is settled law in this country that a riparian owner may separate his uplands from his submerged lands and convey both to different grantees, or he may sell one and withhold the other. This rule had been observed when Caples first acquired his title. It was also observed when he mortgaged to Taliaferro and it was observed when Caples purchased from the Trustees of the Internal Improvement Fund. Taliaferro was on knowledge of these transactions and we think he is now estopped to claim as a riparian owner. He is attempting to extend his mortgage over security that was not embraced therein and which he knew had been conveyed to Caples by valid act.

The second question we are called on to answer is whether or not the Trustees of the Internal Improvement Fund are authorized to sell and convey the submerged lands brought in question.

The answer to this question turns on the interpretation of Section 1391, Compiled General Laws of 1927, which is as follows:

"The title to all islands, sand bars, shallow banks or small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, of other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties, is hereby invested in the trustees of the Internal Improvement Fund of the State of Florida, to be held by the State of Florida, and disposed of as hereinafter provided."

Examination of this Act discloses four classes of submerged lands that the Trustees of the Internal Improvement Fund are authorized to sell, viz.: (1) islands, sand bars and shallow banks, (2) small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, (3) similar of other islands, sand bars, and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel not less than five feet deep at high tide, and (4) sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties.

It may be regarded as settled that title to all submerged lands whether tide or fresh is held by the states in trust for all the people of the respective states, that such trust is governmental and may not be completely alienated but that in the interest of all the people, the states may grant to individuals limited privileges or rights in such lands. Brickell v. Trammell, 77 Fla. 544, 82 So. 221.

The wisdom of a statute like the one under review was never more urgent than it is in this State. There are literally thousands of acres and thousands of miles of coast line affected by it but it was never designed to deprive any bona fide owner of his right in the foreshore. Many of the lands affected by the Act are bogs and quagmires, fit for nothing but to breed snakes and mosquitoes in their native state but acquired by private enterprise, they have been drained or filled and turned into valuable holdings.

Deep waters have been made next to cities and attractive residential districts have replaced eyesores and unsanitary breeding places of every conceivable species of pathogenic bacteria. The potentialities of such sales nowhere approach the possibilities that they do in this State because of its great extent of seacoast and unusual expanse of shallow bottoms. Examples of their value about many of the municipalities attest the wisdom of the Act authorizing them. The proceedings incident to the sale brought in question were in compliance with the statute.

The statute providing for the sale of submerged lands provides ample safeguards to protect upland owners and inhibits such sales if not shown to be clearly within the law. In this case, Caples realizing that he did not acquire title to the submerged lands in front of his uplands, when he purchased the latter, he pursued the means provided for him to do this sixteen years later. In view of the history of the transaction, it is out of all reason to say that he intended to mortgage his submerged lands when he mortgaged the uplands.

The judgment below is accordingly reversed.

Reversed.

WHITFIELD, BUFORD and CHAPMAN, J. J., concur.

BROWN and THOMAS, J. J., dissenting.

8

BROWN, J. (dissenting).—This suit was instituted by filing a bill in equity by appellees Taliaferro, both as upland proprietors and as taxpayers, against appellants, Caples and the Trustees of the Internal Improvement Fund, to quiet title to certain lands located in Sarasota County, Florida, and to protect them against an alleged infringement of their riparian rights. The bill fully set forth complainants' claim to the uplands involved, extending to and bounded on the west by Sarasota Bay, a navigable body of water, together with the riparian rights incident thereto both at common law and under the Florida statutes, and alleged that a large body of so called submerged land in Sarasota Bay immediately adjacent to and in front of complainants' upland had been attempted to be sold under contract to appellant Ellen F. Caples, by the defendant Trustees of the I. I. Fund and also averred that the claim of the defendants constituted a cloud on complainants' title, preventing sale of the land by the complainants.

The bill of complaint also asserted that the so-called submerged lands so attempted to be sold were not within the classification or purview of Sec. 1061 R. G. S. 1920 (Sec. 1391 C. G. L.) defining lands that the Trustees were empowered to sell; that the submerged lands involved are covered by the waters of Sarasota Bay, a navigable body of water; that the waters in the area here involved are navigable in fact for all usual useful purposes; that none of the submerged land results from digging of a channel by the Government, that none of the submerged area is separated from the mainland by a channel not less than five feet deep at high tide, or by any channel; that in a very substantial part of the area involved the land, constituting the bottom of Sarasota Bay is covered by more than three feet of water at high tide; that in the entire area which

extends westward from the shore approximately one thousand feet, there are no islands, sand bars or shallow banks; and that the lands described and attempted to be sold constitute the natural bottom or bed of Sarasota Bay, sloping gently westward in a plane to a depth of five or six feet of water; that said description included also all of the shoreland between high and low water mark; and that none of said lands were within the purview of the statute. There was ample evidence adduced before the chancellor to sustain these allegations as to the character of the submerged lands.

The appellees bill further alleged that ownership or improvement of the area would cut off access from their upland property to the waters; that private ownership or improvements would deprive them of their right of boating, fishing and bathing in the entire area extending approximately 1000 feet into the navigable waters of Sarasota Bay, along their entire front of approximately 1000 feet, said area consisting of approximately 22 acres under the waters of the bay immediately adjacent to their upland property; and that any filling or wharving of the submerged area would injuriously impair and destroy appellees' view across the bay, and other valuable special property rights, contrary to their riparian rights at common law and as expressly guaranteed by the 1921 statute (Sec. 1774 C. G. L. 1927).

The record shows that the appellant. R. C. Caples acquired fee simple title to the controverted lands in 1910. Prior thereto the property had been officially platted and subdivided as "Shell Beach" and the plat duly placed on the public records by the grantors of Caples, but before the sale to Caples the plat had been vacated, and the property returned to its original status of acreage in its wild unimproved state. That part of the property here involved was

conveyed to Caples by government description. The property, as shown by the plat, was bounded on the west by Sarasota Bay, a navigable bay of the Gulf of Mexico. In 1925 R. C. Caples and wife, Ellen F. Caples, made application to the Trustees of the Internal Improvement Fund to purchase the submerged land adjoining their property on the west and received a deed thereto in 1926 from the said Trustees of the I. I. Fund. They gave a mortgage to the Trustees for the balance due on the purchase price of the lands. In 1927 R. C. Caples borrowed a certain sum of money from T. C. Taliaferro and gave him a mortgage describing the herein controverted upland property, the description used in the mortgage being according to said recorded plat of "Shell Beach" instead of the government property description. Mrs. Ellen F. Caples joined in this mortgage. In 1932 Taliaferro foreclosed the mortgage and received a Master's deed to the property covered by the mortgage. In 1935, at the suggestion of the I. I. Trustees, the Caples, or rather their grantee, Sarasota Improvement Company, conveyed the submerged lands to the Trustees of the Internal Improvement Fund, the purchase money mortgage was canceled, and the Caples took contract of purchase and sale of the property, executed by and between the Trustees and Mrs. Caples, the contract price being for substantially the same amount as the balance due on the purchase money mortgage executed in 1926 with accrued interest. At the request of Mr. Caples, the contract was made in the name of Mrs. Caples, who thereby became the purchaser under the contract, which contract was not recorded until 1935, the year in which this suit was instituted. The amount secured by the original mortgage was $1616.25 while the contract required Mrs. Caples to pay $2,835.00 in twenty annual installments.

The defendants filed their answer denying the allegations of the bill of the complainants in so far as the riparian ownership was concerned, setting forth more specifically that the defendants were the owners of a small strip of land lying between the complainants' upland and the Bay of Sarasota, designated as "Palm Walk." See rough copy of part of plat hereto attached. (Page 12.)

A Special Master was appointed and voluminous testimony taken. The Court then entered its order decreeing complainants to be the owners of all the controverted property to the high water mark, together with the riparian rights incident thereto, and quieting title in the complainant. The court further decreed that the Trustees of the Internal Improvement Fund were without authority to sell the submerged lands in question and declared the deed of conveyance and the subsequent contract of sale to be nullities. From this decree the defendants have appealed.

The controversy here really centers around two questions; namely, did the mortgage deed from R. C. Caples and wife, Ellen F. Caples, to T. C. Taliaferro include all lands to the high water mark of Sarasota Bay, the foreclosure of which made Taliaferro a riparian owner with all rights and privileges thereto attached; and second, did the Trustees of the I. I. Fund have the authority to sell and dispose of the submerged lands here in question?

The lower court answered the first of these qustions in the affirmative and the second in' the negative.

The first question necessarily involves the mortgage and the description of the property covered by it. The description in the mortgage deed from R. C. Caples and wife, Ellen F. Caples to T. C. Taliaferro, being the same in the final decree of foreclosure and also in the Master's deed, was:

Shell Beach

Sec.-35 T.35 S, R.17 E.

Sarasota Bay

Sarasota Ave.

Date Ave.

Palm Walk

High Water Line

Sec. Line

Reserve

"All of Blocks 1, 2 and 3 of said Plat or map of Shell Beach, and off of the land included in that part of the said Plat of map of Shell Beach lying between said Blocks 1, 2 and 3 as the North boundary and the small stream in the reserve to the North of Blocks 4 and 5 as the South boundary, extending East from said small stream to a point 129 feet due North from the South West corner of NW¼ of Section 1, Township 36 South, Range 17 East, and containing 23 acres, more or less, according to Plat of Shell Beach recorded in Plat Book 1 at Page 121 of the Public records of Manatee County, Florida, and including all the interest of the grantors in all streets, alleys and reserve space in all of the above area."

It is a well settled principle of law that parol testimony is inadmissible to vary or qualify the description of land in a deed of conveyance when there is no ambiguity in the description. In the absence of ambiguity, the intent of the parties is to be determined by the description used in the deed or mortgage. And where a deed refers to a map or plat, or plan of survey, for a description, or to identify and describe the land conveyed, such map, plat or survey becomes as much a part of the instrument as if actually copied into it. See Andreu, et al., v. Watkins, 26 Fla., 390, 7 Sou. Rep. 876. The fact that a map or plat referred to in a deed or mortgage for purposes of description has been rescinded or vacated by the owner does not lessen its effect for purposes of description—at least in cases, such as this, where the plat or map was duly recorded and made a part of the public records.

It is elementary that the riparian rights of an owner of uplands abutting on navigable tide waters pass with a conveyance of the uplands unless expressly reserved. A riparian owner may separate the ownership of upland from

the riparian property by conveying one and retaining the other, or by a conveyance to different grantees; *but the intent to effect such a separation must clearly appear.* See 45 C. J. 573 (par. 276); Rasmussen v. Walker Warehouse Co., 68 Ore. 316, 136 Pac. 661; Broward v. Mabry, 58 Fla. 398, 50 So. 826. The riparian rights may be retained in the grantor by expressly reserving a strip of upland along the shore, so as to prevent the passing of title to the water's edge, or by conveying by metes and bounds, which metes and bounds describe a tract which has no actual contact with the water, or by conveying the upland according to a plat which is sufficient to create a presumption of the reservation of the riparian rights. As bearing on this question see 45 C. J. 574; Richardson v. Prentis, 48 Mich. 88, 11 N. W. 819; Rasmussen v. Walker Warehouse Co., *supra.* This rule might well apply where there is nothing said in a deed about the reserved areas shown in the plat as abutting on the water tending to show that there was an intent to convey all the property including all reserved areas.

Upon an examination of the description involved in the mortgage deed in the instant case it is readily seen that the mortgagors did not directly express any intention to reserve "Palm Walk" or their riparian rights. The appellees contend that the description in the mortgage and Master's deed covers the entire area and may rightly be divided into three parts.

Briefly, appellees' contention in this regard is as follows:

The first part of the description covers the northerly or subdivided part of the subdivision involved. The language used as to this subdivided part is:

"All of Blocks 1; 2 and 3 of said Plat or map of Shell Beach."

The second part of the description covers that part of

the unsubdivided area lying south of the above area and
north of a small stream in the "reserve," which stream runs
westwardly into the Bay, and through or across "Palm
Walk," thus forming the South boundary of the area in-
volved. The language of the description in this respect is
as follows:

"* * * All of the land included in that part of the said
Plat or map of Shell Beach lying between said Blocks 1,
2 and 3 as the North boundary and the small streams in
the reserve to the North of Blocks 4 and 5, as the South
boundary, extending East from said small stream to a point
129 feet due North from the Southwest corner of NW¼
of NW¼ of Section 1, Township 36, South, Range 17
East," * * *"

By reference to the Plat of Shell Beach it is at once ap-
parent that this description covered an unsubdivided area
of the subdivision, but that "Palm Walk" was and is de-
lineated as running North and South for a distance of about
1000 feet on the West margin of the entire area shown by
the plat, both the subdivided and the unsubdivided, except
where the small stream crosses it. The language above
quoted ("and all of the land included in that part * * *")
necessarily included that part of "Palm Walk" as delineated
in this unsubdivided area, from the Stream Northward the
stream being referred to as the "South boundary," but it
does not, to our minds, clearly cover that part of Palm
Walk immediately West of the subdivided area shown by
the Plat, that is, Blocks 1, 2 and 3, unless the next clause
to be considered can be said to cover it, either expressly or
by operation of law.

After having described in the first granting part of the
description "all of Blocks 1, 2 and 3," and after having
expressly included in the second granting part "all of the

land * * *" lying between said blocks 1, 2 and 3 and the small stream to the South, the language then used by Caples in the third granting part of the description, so appellees contend, removes all doubt as to the intention of the grantors, such language being: 'including all the interest of the grantors *in all streets, alleys and reserve space in all of* the above area." Emphasis added.

This description, it is contended, quite clearly shows not only the intent to convey the property as platted but also an intention to convey all property and all interest that the grantors had in any of the streets or reserve space included in that part of the plat referred to. This necessarily included that portion appearing on the plat and designated as "Palm Walk," which the evidence shows varied in width from 10 to 24 feet, but averaged about 21 feet in width. There is nowhere in this description any language that shows any intent on the part of the grantors to reserve the narrow strip along the water front of the property, shown as Palm Walk, and in the absence of such intent being expressly shown there is no separation of the uplands from the waters of the Bay. Where, as here, the conveyance was made according to a plat and there was an express conveyance of all interest in "all streets, alleys and reserve space" in the conveyed area as shown by the plat, the intent to convey the space designated as Palm Walk, thus giving the land conveyed a water boundary and consequent riparian rights, is made clear. Such are the very reasonable contentions made by appellees.

The lower court evidently accepted this view, and held that this strip of property passed to the grantee, T. C. Taliaferro, and that he was a riparian owner with all rights and privileges thereto attached.

The conclusion thus reached by the court below is rein-

forced by the operation of legal principles upon the description contained in the mortgage deed, which description as we have seen, is made with reference to and is based upon the recorded plat. These instruments convey all of blocks 1, 2 and 3 as shown by the plat of Shell Beach, and said plat shows that Block 3 being the block facing the Bay, contains a number of lots abutting upon the narrow strip along the water front designated as "Palm Walk," and our conclusion is that the fee to this narrow strip between said lots and the high water mark of Sarasota Bay passed by operation of law to the grantee in said mortgage deed and the Master's deed based on the foreclosure of the mortgage deed.

It is well settled that a conveyance of land abutting on a street, way or highway carries the fee to the center of the street unless expressly reserved. It is also recognized by our decisions that the conveyance of lands abutting a street, way or highway on both sides thereof, as shown by a recorded plat, invests the fee title in the grantee to the entire width of such street, way or highway between such conveyed lands. See Seaboard Airline Railway Company v. Southern Investment Company, 53 Fla. 832, 44 So. 351; Smith v. Horn, 70 Fla. 474, 70 So. 435; Burns v. McDanial, 104 Fla. 526, 140 So. 314; New Fort Pierce Hotel Company v. Phoenix Tax Title Corporation, 126 Fla. 552, 171 So. 525. In Burns v. McDanial, *supra*, it was also held that if the subdivider's offer to dedicate land for street purposes, as evidenced by his plat, was never accepted or if such offer to dedicate was accepted and lawfully surrendered, the holder of title to property abutting such tract so offered for dedication held title to the middle of the street, as shown by the plat, relieved of the easement so far as the public was concerned.

There are also authorities holding that when a street or highway is laid out wholly on the margin of a grantor's land, a conveyance of the lands abutting such street or highway carries the fee to the entire width of such street or highway unless expressly reserved. *In re*: Robbins (Minn.) 24 N. W. 356; Haverman v. Baker, 28 N. E. 370, 128 N. Y. 253; 4 R. C. L., 79; Elliott on Roads and Streets, 3rd ed. Sections 914, 918. In the Minnesota case of *In Re:* Robbins, *supra,* it was held that where the original proprietor of a tract of land caused the same to be platted into lots and streets, and laid a street 40 feet in width on the margin of the tract, wholly on his own land, the next adjoining platted land belonging to a stranger, his conveyance of lots bounded on such street carried the fee in the street to the opposite boundary line thereof and it would not be presumed in such a case that the grantor intended to retain an interest in any portion of the street fronting the lots so conveyed.

The more specific question here involved is this: Where a street, way or walkway is laid out wholly on the margin of the grantor's lands, said street, way or walkway being bordered by navigable water, does a conveyance of land abutting on such street, way or walkway, as designated on the plat, carry the fee to the width of such street, way or walkway, together with all riparian rights incident thereto, unless expressly reserved?

While there is some conflict in the decisions on this question, we have reached the conclusion that the answer should be in the affirmative.

Although there is some dicta to the contrary in the case of Marshall v. Hartman, 104 Fla. 143, 139 So. 441, the opinion in which case was written by this writer, it was said that:

"The *original owner* who made the plat and who owned the fee to the high water mark might, under some very respectable authorities, be held to be thus vested with riparian rights, in spite of his dedication of a street along the waterfront of his property. Thus in Section 66b of Farnham on Waters, p. 305, it is said: 'The laying out of a highway along the shore, the title to the fee of which is in the public, will deprive the owner of the land abutting on the highway of his former riparian rights, but the highway will not have that effect if the fee of the street remains in the abutting owner.' Citing Brooklyn v. Smith, 104 Ill. 429, 44 Am. Rep. 90. See also to the same effect, 27 R. C. L. 1075, where other cases are cited. Where the fee to a street along a river front is in the abutting owner, the title to accretions will be in him. Farnham on Waters, 71a, p. 328; Banks v. Ogden, 2 Wall. 57, 17 L. Ed. 818; Kinzie v. Winston, 56 Ill. 56. As bearing on this question, see City of Miami v. F. E. C. Ry. Co., 79 Fla. 539, 553, 84 So. 826."

In Farnham on Waters, 667-668, it is said that the riparian rights of an abutting owner depend on his land touching the water, and if the fee in a highway separating his land from the water is in the public, the abutting owner has no riparian rights, and that whether the dedication carried the title or a mere easement for highway purposes will depend on the intent shown by the terms and manner of dedication. The manner of the offer to dedicate Palm Walk as shown by this plat indicates an intention to dedicate an easement of this strip of land for a walkway in front of the lots adjacent to Sarasota Bay, being the lots in Block 3, as shown by the plat, the fee being retained in the subdivider or maker of the plat. Thus, a conveyance according to the plat by the owner of these lots in Block 3 did vest in the grantee the fee title to the strip of land,

20

designated as Palm Walk, between such lots and the high-water mark of Sarasota Bay.

If I may be permitted to criticize my own former opinion, I might observe that a close reading of the opinion in the case of Marshall v. Hartman will show that a decision of the question here involved was not necessary to the decision of that case, the facts being quite different from those here presented, there being actual filled in land between the street and the river at the time of the trade which was obvious to both parties.

See in this connection Healey v. Babbett, 14 R. I. 532; Rowe v. James, 71 Wash. 267, 128 Pac. 529; Saccone v. West End, 224 Pa. 554, 73 Atl. 971, 24 L. R. A. (N. S.) 539; Johnson v. Arnold, (Go.) 18 S. E. 370.

In the case of Taylor v. Armstrong, 24 Ark. 102, a street existed which was bounded by navigable water, without any land intervening between it and the water. The land was platted and lots sold as abutting on the street. The Court held that a conveyance of the upland lots bordering on the street carried title to the entire width of the street, together with riparian rights; that the grantor being the owner of the lots, the presumption was, in the absence of proof to the contrary, that he was the owner of the fee in the soil of the street, not only to the center of the street, but to the margin of the river, "there being no opposite proprietor."

In the case of Gifford v. Horton, 54 Wash. 595, 103 Pac. 988, the court held that the owner of lots bordering on a street which in turn was bordered by navigable water, with no land intervening between the land and the water, acquired riparian rights on account of his ownership of the fee to the entire street. In that case the court said: "The grantee of lots facing on a public street, which borders a

navigable lake, and beyond it there is no property susceptible of private ownership, took the fee to the entire street, unless the terms of the grant or the circumstances limited the grant to the center of the street."

In the case of Johnson v. Grenell, 188 N. Y. 407, 88 N. E. 161, 13 L. R. A. (N. S.) 551, where a deed described a lot as laid down on a map made and filed by the grantor, which lot extended to a boulevard 50 feet wide which was bordered on the other side by the water of a navigable river, carried the fee title to the entire width of the boulevard, as shown upon the map extending to the water adjacent, together with the riparian rights attaching thereto, there being nothing to rebut the presumption that the grantor did not intend to retain the fee in the soil of the boulevard.

To like effect is the case of Wait v. May, 48 Minn. 453, 51 N. W. 471; Ennie v. Grove, 103 N. Y. S. 1088, affirmed in 105 N. Y. 1114; White's Bank v. Nichols, 64 N. Y. 65-70; also 2 Elliott on Roads and Streets (3rd ed.) Sec. 919.

The question as to whether a deed of upland lots carries title to the water's edge depends to a great extent upon the intent of the parties as expressed in the descriptive parts of the deed, in the light of the entire conveyance, the locality to which it applies, and the legal effect to be given to the language of the description as explained and illustrated by the map or plat which is referred to therein and in legal effect made a part thereof. It is for this reason and because of the variations in the facts in each particular case, that the apparent and sometimes actual conflict in the decisions dealing with this general question has come about. However, in view of the reasoning contained in the above cited decisions I am of the opinion that the conclusion

reached by the chancellor in this case was correct and should not be disturbed.

In his final decree, the learned chancellor held that:

"It is immaterial that the plat of Shell Beach had been vacated at the time of the execution of the mortgage here involved, through which complainants derive title, the property having been described therein by express reference to the said plat of Shell Beach."

I think this holding was sound. See New Fort Pierce Hotel Co. v. Phoenix Tax Title Corporation, *supra;* Paine v. Consumers Forwarding Co., 71 Fed. 626; Roxana Petroleum Corporation v. Sutter, 28 Fed. (2) 159; Smith v. Horn, *supra.*

The second question involves the authority of the Trustees of the Internal Improvement Fund to sell or dispose of the submerged lands underneath the waters of Sarasota Bay adjoining the property of the plaintiffs on the west.

The appellants claim authority for the sale of the lands to the Caples (originally to Mr. Caples in 1926, and later on to Mrs. Caples in 1933) under and by virtue of Chapter 7304, Acts of 1917, paragraphs 1 and 2; now appearing as Section 1391, *et seq.,* Comp. Gen. Laws of 1927. Section 1391, C. G. L. 1927, provides:

"The title to all islands, sand bars, shallow banks or small islands made by the process of dredging of the channel by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, of other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not,

at this date, invested in prior parties, is hereby invested in the Trustees of the Internal Improvement Fund of the State of Florida, to be held by the State of Florida, and disposed of as hereinafter provided."

Section 1392 then provides the procedure for the sale by the trustees of such lands; that is, by giving notice by publication, in order to give interested parties an opportunity to object to the sale of the lands. This section recognizes as a valid ground of objection to such proposed sale, a showing that the transfer of such submerged lands to private ownership would interfere with the rights granted to riparian owners by the State of Florida.

Any attempted sale of submerged lands must be made pursuant to the above sections of our statutes. The Trustees of the Internal Improvement Fund have no authority otherwise to convey title to lands under navigable waters that belong to the State in its sovereign capacity. See Brickell v. Trammell, 77 Fla. 544, 82 Sou. Rep. 221, wherein this Court said:

"After the Revolution resulting in the independence of the American states, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the states in which they were located, in trust for all the people of the states respectively. * * *

"The trust in which the title to the lands under navigable waters is held governmental in its nature and cannot be wholly alienated by the states. For the purpose of enhancing the rights and interests of the whole people, the states may by appropriate means grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the states respectively of the control and regulation of the uses af-

forded by the land and the waters, or so as to interfere with the lawful authority of Congress. See 62 Fla. 549, 57 Sou. Rep. 428; Clement v. Watson, 63 Fla. 109, 58 Sou. Rep. 25, Ann. Cas. 1914A, 72."

Also see Thiesen v. G. F. and A. Ry. Co., 75 Fla. 28, 78 So. 491; Deering v. Martin, 95 Fla. 224, 116 Sou. Rep. 54; and Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 Sou. Rep. 249. The Court in the latter case said:

"Our conclusion therefore is that Chapter 7304 of the Acts of 1917 (Section 1391, *et seq.,* Comp. Gen. Laws) is a valid Act, and is not in conflict with the State or Federal Constitutions, nor with the congressional Act of March 3, 1899, (Sections 9 and 10, 33 USCA par. 401, 403), nor with the trust under which the State holds the title to lands under navigable waters. If there should be any attempt, in the administration of that Act, to impair the rights of riparian proprietors, or the rights of the people of this state under the trust doctrine, such proposed action by the trustees could be enjoined at the suit of a proper party under the principles laid down in the case of Deering v. Martin."

In the instant case the Chancellor found that the land conveyed, or contracted to be. conveyed, by the Trustees of the Internal Improvement Fund was not of the nature and character of the lands which said Trustees are authorized to convey within the terms of the statute hereinabove quoted. I think the evidence clearly sustains this finding.

That part of the statute, "or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties," does not, in my opinion apply to this property. Such a sale of lands as those involved here would not be in keeping with the

trust under which the State holds title to all lands under navigable waters for the use and benefit of its citizens. See State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 47 Sou. Rep. 353, 22 L. R. A. (NS) 337, wherein we said:

"The navigable waters of the state and the lands under such waters including the shore or spaces between ordinary high and low water marks, are the property of the state or of the people of the state in their united or sovereign capacity. Such lands are not held for purposes of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the state for purposes of navigation, commerce, fishing and other useful purposes afforded by the waters thereon.

"The state may, in the interest of the public welfare, make limited disposition of portions of the lands under navigable waters within its borders, or may permit the use thereof, when the rights of the whole people of the state as to navigation and other uses of the waters are not materially impaired."

It was also stated in the writer's concurring opinion in the case of Deering v. Martin, 95 Fla. 224, 116 Sou. Rep. 54, which was joined in by all the members of the Court, that:

"There may be many stretches of submerged lands in the numerous bays, sounds, and inlets of the tidal waters in this state upon which the water is not more than three feet deep at high tide, and which are separated from the shore by channels not less than five feet deep at high tide, which are in fact navigable for many useful purposes, and valuable for fishing and other purposes, that the Legislature could not, either by a direct Act or through the internal improvement board, grant to any private individual or corporation for *private purposes* without violating the trust

under which it holds such lands for the benefit of the people of the state for the purpose of navigation, fishing, boating, etc. Perhaps no such arbitrary depth standard should be used as the final and ultimate test. The mere fact that the Legislature may say, in effect, that water not more than three feet deep at high tide is not navigable does not necessarily make it so. Navigability is to some extent a question of fact. 1 Farnham on Waters, pp. 100 and 119, and cases cited."

After a careful examination of the record and the law applicable, I see no adequate reason for this Court to disturb the findings of the Chancellor on this, or any other, phase of the case.

The other questions presented by appellants in their very able briefs (numbered 3, 4, 5 and 6) have been carefully considered, but no reversible error appearing on the part of the trial court, its rulings should in my opinion be upheld.

Believing as I do, that the holding of the chancellor that appellees are riparian owners of the lands in question and that the attempted sale of the submerged lands in front of appellees' uplands was void for want of authority in the Trustees of the Internal Improvement Fund, I do not deem it necessary to consider the questions raised by appellees on a cross assignment of error.

For the foregoing reasons I am convinced that the judgment of the lower court should be affirmed.

THOMAS, J., concurs.

## ON REHEARING

### ORDER

PER CURIAM.—This cause came on to be heard on petition for rehearing, Circuit Judge Rowe sitting in place of Mr. Justice BUFORD, disqualified.

On due consideration after oral argument on the petition for rehearing, Mr. Chief Justice TERRELL, Mr. Justice WHITFIELD, Mr. Justice CHAPMAN, and Circuit Judge Rowe are of the view that the majority opinion of the Court filed March 8, 1940, should be adhered to. Mr. Justice WHITFIELD and Circuit Judge Rowe each filing concurring opinions thereto, which are agreed to by Mr. Chief Justice TERRELL and Mr. Justice CHAPMAN. Both concurring opinions are applicable to this and the companion case of like title filed the same date. Mr. Justice BROWN and Mr. Justice THOMAS adhere to the dissenting opinion of the former filed on the original hearing.

Done and ordered this 24th day of September, 1940.

TERRELL, C. J., WHITFIELD, BROWN, CHAPMAN, THOMAS, J. J., and ROWE, Circuit Judge, concur.

BUFORD, J., disqualified.

WHITFIELD, J.—In this case title to the uplands was conveyed to Caples, extending to high water mark on the navigable bay. Thereafter Caples received conveyances of title from the State to the adjoining submerged land as provided by statute. Later Caples mortgaged the uplands to appellees' ancestor, describing such uplands not by government surveys but by reference to a vacated plat or map of the uplands and by metes and bounds, apparently intending not to extend the description of the *mortgaged* uplands to high water mark on the bay. The uplands were mortgaged to secure a loan, and there was not a conveyance of the title for the uses of the mortgagee. No mention of, or reference to, riparian rights was made in the mortgagee. apparently for the reason that the submerged lands below high water mark had been conveyed to Caples, the mortgagor, for his own lawful uses and purposes. The title to the sub-

merged lands not then being in the State of Florida, but in Caples, the mortgagor, he apparently did not intend the *mortgage* to cover any riparian rights that would affect his ownership rights in the submerged lands. Purchasers at the mortgage foreclosure sale obtained no greater rights than those covered by the intendments of the mortgage. While the submerged lands are covered by navigable waters, owners of the adjoining uplands may have the same rights in the navigable waters as are accorded to the public under the law.

As no private riparian or other rights in the submerged lands were intended by the mortgagor to be included in the mortgage of the uplands, the appellees are not entitled to have cancelled of record the instruments relating to the conveyance of such submerged lands to Caples under the statute.

The State is not asserting any rights of the public in the navigable waters as being illegally affected by the conveyance of the title to the submerged lands by the Trustees of the Internal Improvement Fund under the statute. Nor is the sale and conveyance of the submereged lands by the Trustees of the Internal Improvement Fund being challenged by the State.

TERRELL, C. J., and CHAPMAN, J. J., concur.

ROWE, Circuit Judge (concurring).—On the question of whether or not the mortgage deed from Caples to Taliaferro described and carried title to all lands to high water mark on Sarasota Bay and thereby made him a riparian owner with all the rights and privileges as such, I agree with the main opinion of Mr. Chief Justice TERRELL, concurred in by Mr. Justice WHTITFIELD and CHAPMAN.

On the question of whether or not the Trustees of the In-

ternal Improvement Fund are authorized to sell and convey the submerged lands brought in question which is discussed in the main opinion, it appears that the material testimony of some of the witnesses was at variance from that of others and that many years separated the time at which their testimony was taken. I am unable to tell how this fact influenced the Chancellor.

I think the criterion to govern the trustees of the Internal Improvement Fund in the sale of submerged lands under Section 1391, Compiled General Laws of 1927, should be that governing the Department of the Interior in patenting lands to the State under the Swamp Land Grant Act of 1850, that is to say, if the larger fraction of the unit advertised to be sold is shown conclusively to be within the terms of the Act, the entire unit may be construed to be covered by and sold under it, unless in particular cases the conditions affecting the public interest are different, in which case a different rule should be applied to insure the public welfare.

I am further impressed with the fact that the physical test to determine whether or not the lands applied for are subject to sale under the Act should be that found to exist at or near the time the application is made. Such tests should be made under normal tidal and other conditions. My agreement with the dissenting opinion of Mr. Justice BROWN in the companion case to this, is conditioned on this concurrence.

It may be that such requirements were observed by the Chancellor. If they were not, the cause should be reversed on this point with directions to proceed accordingly.

TERRELL, C. J., WHITFIELD and CHAPMAN, J. J., concur.